UNIVERSITY OF NEVADA, UNIVERSITY OF NEVADA, LAS VEGAS, DONALD H. BAEPLER, AS PRESIDENT OF THE UNIVERSITY OF NEVADA, LAS VEGAS, AND AN OFFICER OF THE UNIVERSITY OF NEVADA, AND JAMES BUCHANAN, II, DR. FRED ANDERSON, JOHN BUCHANAN, LILLY FONG, CHRIS KARAMANOS, MOLLY KNUDTSEN, DR. LOUIS LOMBARDI, BRENDA MASON, JOHN TOM ROSS, AS MEMBERS OF THE BOARD OF REGENTS OF THE UNIVERSITY OF NEVADA, APPELLANTS, *v.* JERRY TARKANIAN, RESPONDENT.

No. 10425

May 17, 1979                                    594 P.2d 1159

390

*Jones, Jones, Bell, Close & Brown,* Las Vegas, for Appellants.

*Lionel Sawyer & Collins,* Las Vegas, for Respondent.

*Wiener, Goldwater & Waldman,* Las Vegas, for Amicus Curiae National Collegiate Athletic Association.

## OPINION

By the Court, MOWBRAY, C. J.:

The respondent, Jerry Tarkanian, commenced this action in the district court seeking declaratory and injunctive relief from a severance order barring Tarkanian from association with the athletic program of the University of Nevada, Las Vegas (UNLV).

UNLV, its president and regents have appealed. The National Collegiate Athletic Association (NCAA), whose report of Tarkanian's activities was the predicate for UNLV's

order of suspension, is not a party to this action. The NCAA has filed an amicus curiae brief with this court.

## THE BACKGROUND OF THE LITIGATION

UNLV is a public institution of higher learning which is financed by the State of Nevada. It is a member of the NCAA, an unincorporated association of approximately 830 members, including virtually all four year colleges and universities in the United States with major intercollegiate athletic programs. As a member of the NCAA, UNLV contractually agrees to administer its athletic program in accordance with NCAA legislation. The NCAA Constitution provides that "Legislation governing the conduct of intercollegiate athletic programs of member institutions shall apply to basic athletic issues such as admissions, financial aid, eligibility and recruiting; member institutions shall be obligated to apply and enforce this legislation, and the enforcement program of the Association shall be applied to an institution when it fails to fulfill this obligation." Primary responsibility for administering the NCAA enforcement program has been delegated to the Committee on Infractions.

February 26, 1976, the NCAA Committee on Infractions initiated enforcement proceedings involving UNLV by submitting an Official Inquiry to its president, respondent Dr. Baepler. The Official Inquiry was the result of a preliminary investigation conducted over a period of approximately three years by the NCAA investigative staff. The Official Inquiry included, *inter alia,* allegations that Tarkanian had violated NCAA legislation. Upon receipt of the letter of inquiry, UNLV enlisted the aid of the Attorney General of the State of Nevada to conduct a "cooperative investigation".

Hearings before the Committee on Infractions were conducted on November 14, 1976; December 13 and 14, 1976; and March 13, 1977. The record contains the following description of the nature of these proceedings by an NCAA official:

> Once the institution has collected all available information, it then meets with the Committee on Infractions to discuss the information which it has obtained and previously submitted to the Committee in writing. The purpose of this hearing before the Committee on Infractions is for both the institution and the NCAA investigative staff, for the first time, to present specific information to the Committee concerning alleged violations of NCAA legislation. This procedure provides an adequate opportunity for the institutional representatives to debate any of

the information presented to the Committee by the investigative staff or the institution, and to be advised of the source of the information upon which each allegation is based. Both the Committee on Infractions and the University will be informed at the hearing of the identity of the source of evidence upon which an allegation is based as well as any actual details or evidence reported by individuals interviewed.

The requests of UNLV for prior disclosure of the factual bases or sources of the allegations contained in the letter of inquiry had been denied. Shortly before the first hearing was scheduled, the NCAA notified the university that it had changed its prior position and would allow counsel representing university employees named in the allegations to be present. Tarkanian was present at all of the hearings and was represented by counsel at the second and third. According to the record herein, "the charges and allegations against Jerry Tarkanian were presented by the sole means of having either of two NCAA staff investigators . . . orally relate what each of them recalled of conversations he purportedly had with certain individuals concerning their knowledge of purported violations of NCAA legislation by Jerry Tarkanian." The sources of the information reported to the investigators were not present to give testimony or be cross-examined. A tape recording of the proceedings was made by the NCAA, but no other reporting was allowed, and the tape was not made available for later transcription by the NCAA, although university attorneys were allowed to travel to Kansas City to listen to it.

On April 26, 1977, the Committee on Infractions issued Confidential Report No. 123(47) containing the Committee's findings of violations of NCAA legislation and recommending penalties to be imposed on UNLV for such violations. Among the Committee's findings was a charge that Tarkanian had either contacted or arranged for others to contact principals involved in the infractions investigation in an effort to discourage them from reporting violations to the NCAA or to cause them to give untruthful information to the university's investigators. Included in the penalty section was an order directing UNLV to show cause why additional penalties should not be imposed if it did not take disciplinary action with regard to "Head Basketball Coach Jerry Tarkanian which, in the Committee's present view, should be complete severance of any and all relations Tarkanian may have, formally or informally, with the University's intercollegiate athletic program during the period of the University's probation including, but not limited to, activities associated with administration, supervision,

coaching, recruiting, athletic booster groups and public relations or fund-raising activities related to the University's athletic program." The university's attention was drawn to the "responsibilities of the institution" under NCAA legislation "to provide due notice and hearing to the involved individual before taking any disciplinary or corrective action."

UNLV appealed the findings and penalty provisions of the report to the NCAA Council. In its written memorandum the university contested the factual bases for twenty-seven of the Committee's findings, including some twenty which directly or indirectly involved Tarkanian, contending that evidence obtained in its own investigation demonstrated that no violations had occurred. The university was critical of the procedures employed by the NCAA, and attacked the credibility of the two NCAA investigators who had presented information to the Committee on Infractions. Tarkanian and the university were allowed twenty and thirty minutes, respectively, for oral presentation of information to the Council. On August 25, 1977, the NCAA Council accepted the findings and recommended penalty of the Committee on Infractions.

On September 6, 1977, pursuant to notice, Tarkanian was given a hearing before a hearing officer appointed by the university. Tarkanian was advised that the charges were as specified in the NCAA Confidential Report, that he could have assistance of counsel, that he could call witnesses in his behalf, and that he could have a transcript of the hearing made. Though the evidence before the NCAA was discussed, no witnesses were presented. Counsel for Tarkanian took the position that the university's own evidence established that no violations had occurred, while counsel for the university argued that the university was bound by the findings of the NCAA. In a written decision, the hearing officer concluded that counsel for the university was correct in his argument that "by joining the NCAA we delegated to that organization the establishment of governing standards and their enforcement as well. We are allowed and encouraged to make our own investigations, but this is in no way a substitute for the investigative functions of the NCAA itself. . . . We must accept their findings of fact as in some way superior to our own." He also found that "in this instance the NCAA's standards of proof and due process were inferior to what we might reasonably expect. . . ." He recommended executing the proposed NCAA sanctions. Dr. Baepler notified Tarkanian the following day that he had decided to follow the hearing officer's recommendation, effective September 9, 1977, noting "the University is simply left without alternatives."

## THE PRESENT LITIGATION

On September 8, 1977, Tarkanian filed suit against UNLV, President Baepler, and the university's regents, seeking an injunction restraining enforcement of the NCAA sanction by the university, and a declaration that he had been denied procedural and substantive due process of law. A major portion of the complaint was directed to the procedures, findings and penalty of the NCAA. By its answer, the university put Tarkanian's allegations concerning the NCAA's activities and procedures at issue. The university also alleged, as an affirmative defense, that it was "a mere extension of the NCAA and, therefore, plaintiff has been afforded not only the due process hearing provided by the University of Nevada, Las Vegas, but also prior hearings conducted by the NCAA, all in compliance with the traditional notions of due process of law."

Prior to trial, an extensive "Stipulation of Facts" was filed by the parties. Some 30 of the 37 stipulations concerned the structure and procedures of the NCAA in general, or its actions in this case in particular. Accompanying the stipulated facts were ten exhibits, including correspondence between the university's investigator and the NCAA staff regarding problems encountered by the university related to NCAA procedures.

At trial, Tarkanian and two other witnesses testified as to the effect of a suspension upon Tarkanian's reputation and career. Tarkanian also called the two attorney-investigators for the university, who detailed their problems with NCAA staff and procedure. The only witness questioned as to the evidence for the underlying charges against Tarkanian was the deputy attorney general who had acted for the university during its investigation; he testified that he had found no factual basis for the charges. No witnesses were presented for the defense.

## AN ACTUAL CONTROVERSY IS PRESENTED

As a threshold issue, amicus curiae suggests that the case should be dismissed as not presenting an actual controversy. As this court has recognized, " 'The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.' " State v. Teeter, 65 Nev. 584, 654, 200 P.2d 657 (1948). The principle requires that a court "act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the action of some third party not before the court." Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41–42 (1976).

*Accord,* National Collegiate Athletic Ass'n v. Califano, 444 F.Supp. 425 (D.Kan. 1978). In State v. McCullough, 20 Nev. 154, 156, 18 P. 756 (1888), the court observed that "Courts uniformly refuse to consider cases brought upon pretended controversies, when the object of the suit is to get the opinion of the court for the benefit of the parties themselves, or to affect the interest of third persons."

In the instant case, it is clear that the purpose of the university's suspension of Tarkanian was to carry out the mandate of the NCAA, and not merely to create a cause of action for litigation. There is no evidence whatever to suggest that had the university prevailed it would then have reinstated Tarkanian, in defiance of what it had determined were its contractual obligations to the NCAA and in the face of prospective sanctions by the NCAA.

This case does present an actual controversy, and therefore shall not be dismissed.

## THE JOINDER OF THE NCAA AS A NECESSARY PARTY

Rule 19 of the Nevada Rules of Civil Procedure provides for the joinder of persons needed for just adjudication. It provides:

> (a) A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action *shall be joined* as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. *If he has not been so joined, the court shall order that he be made a party.* If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. (Emphasis added.)

This provision of the rules of civil procedure reflects certain long-standing policies prevailing in equitable actions, such as the one now before the court, as described in Robinson v. Kind, 23 Nev. 330, 47 P. 1, 47 P. 977 (1896). In such cases all persons with an interest in the subject matter of the suit are to

be made parties "so that there may be a complete decree which shall bind them all." 23 Nev. at 335. If the interest of the absent parties "may be affected or bound by the decree, they must be brought before the court, or it will not proceed to a decree." *Id.* If a defendant before the court may be subjected to future litigation, or danger of loss, under the decree, the absent person must be made a party. *Id.* at 335–36.

As is shown by the mandatory language of Rule 19(a), the enforcement of the rule is not left to the parties themselves. As was said of the prior statute dealing with equitable actions,

> If there are other persons, not parties, whose rights must be ascertained and settled before the rights of the parties to the suit can be determined, then the statute is peremptory; the court must cause such persons to be brought in; it is not a matter of discretion, but of absolute judicial duty. The enforcement of this duty does not rest entirely upon the parties to the record. If they should neglect to raise the question and to apply for the proper order, the court, upon its own motion, will supply the omission, and will either directly bring in the new parties, or remand the cause in order that the plaintiff may bring them in.

Robinson v. Kind, 23 Nev. at 338. Thus the question of waiver is not appropriate to the determination of this issue, and the trial court or the appellate court may raise the issue *sua sponte.* Johnson v. Johnson, 93 Nev. 655, 572 P.2d 925 (1977). This is sound policy, for the rule thus protects the interest of the courts themselves in the efficacy and integrity of their own proceedings, as well as the interests of the parties.

In the case at hand, it is clear from the pleadings, the evidence presented at trial, and the judgment, that the NCAA should have been joined in this action. First, the interest of the NCAA in the subject matter of this litigation was such that either the university would be affected, or the NCAA's ability to protect its interests would be impaired, and in either case further litigation of the controversy would be likely, should it proceed without joinder of the NCAA.

As the situation now stands, regardless of the outcome of this litigation, the NCAA may claim a contractual right to bind the university to enforce the NCAA's decision by sanctions it deems appropriate. This is illustrated in the factual background of Regents of University of Minnesota v. National Collegiate Athletic Association, 560 F.2d 352 (8th Cir.), *cert. dismissed* 434 U.S. 978 (1977), in which the university sought

injunctive relief against NCAA sanctions. In that case, the university had been enjoined by a state court from declaring certain students ineligible, pursuant to an NCAA determination, without a prior university hearing comporting with due process. As a result of such hearings, the university refused to suspend the students. The NCAA then placed the university on indefinite suspension, including a ban on post-season play or television appearances for all sports, until the university complied with its directive to declare the students ineligible. The NCAA took the position that it could not "permit an individual institution to retain either interpretive or enforcement authority" over NCAA legislation. *Id.* at 360.[1]

Respondent argues that the court need not be concerned with the university's position on this account, since the university will be insulated by the terms of the lower court's decree from compliance with the NCAA decision. If the university would be so protected, the NCAA would, to that extent, be unable to protect its interests in its enforcement proceedings. *See* Ky. H.S. Athl. Ass'n v. Hopkins Cty. Bd. of Ed., 552 S.W.2d 685 (Ky.App. 1977).

An independent ground for requiring joinder in this case is provided by the directive of Rule 19(a) that a person be joined when "complete relief" cannot be accorded the parties before the court in his absence. A major objective of this provision is "to have a final and complete determination of the controversy, not to determine issues piecemeal. . . ." Investment Co. v. Reno Club, 66 Nev. 216, 222, 208 P.2d 297 (1949). In this case, the controversy presented involves the NCAA directly, and cannot be completely and justly determined in its absence. The NCAA initiated and controlled the proceedings against UNLV which led to Tarkanian's suspension. The NCAA made the factual findings upon which Tarkanian's suspension was based. To consider the case as if it involved solely the relationship of the university and Tarkanian, or began with the university's notification to Tarkanian of its intent to hold a hearing regarding his proposed suspension, would require the plaintiff to forego constitutional claims to which he may well be entitled.

Plaintiff's fundamental claim in this case is that he was denied his constitutional right to due process of law. "The fundamental requirement of due process is the opportunity to be

---

[1] The NCAA's right to impose these sanctions upon the university was upheld by the Court of Appeals, on the ground that the court order, and due process, were complied with when the university hearings were held, affording procedural due process, and determining that the underlying facts found by the NCAA were essentially correct.

heard 'at a meaningful time and in a meaningful manner.' *Armstrong v. Manzo,* 380 U.S 545, 552 (1965).'' Mathews v. Eldridge, 424 U.S. 319, 333 (1976). It is clear that the meaningful factual determinations in this case, as well as the decision as to the penalty to be imposed, had been made by the NCAA *before* Tarkanian was afforded a hearing by UNLV. A court of equity, in particular, should not be foreclosed from recognizing this reality, and affording plaintiff the relief to which it may entitle him.

As was observed by the Supreme Court of Oklahoma of a similar attempt by the NCAA to insulate from judicial scrutiny actions it had taken which affected, through a member university, certain coaching employees:

> Courts are normally reluctant to interfere with the internal affairs of voluntary membership associations. However, in particular situations, where the considerations of public policy and justice are sufficiently compelling judicial scrutiny and relief are available. In dealing with an organization in which membership is an economic necessity, the courts must be particularly alert to the need for protecting the public welfare and advancing the interests of justice by reasonably safeguarding the individual's opportunity to earn a livelihood while not impairing the proper standards and objectives of the organization. The necessity of court action is apparent when the position of a voluntary association is so dominant in its field that membership in a practical sense is not voluntary but economically necessary.

Bd. of Regents v. Nat. Collegiate Ath. Ass'n, 561 P.2d 499, 504 (Okla. 1977) (footnotes omitted).

It is therefore clear that the instant case falls squarely within the mandate of NRCP 19(a). We note that the briefs of the parties have cited a number of cases from the federal jurisdictions discussing Fed.R.Civ.Proc. 19(b), which addresses the situation in which a party *cannot* be joined. In such a situation, considerable weight is given the positions taken during litigation by the parties themselves, and to the fact that reversal will require dismissal of the entire action. *See, esp.,* Provident Bank v. Patterson, 390 U.S. 102 (1968). In this case, however, there is no contention that the NCAA is not amenable to service of process or that its joinder would affect the jurisdiction of the court below.[2] In such circumstances, consideration of the issues raised by NRCP 19(b) is not warranted. *See* Robinson v. Kind, *supra,* 23 Nev. 330, 47 P. 977 (petition for rehearing).

---

[2] To the contrary, see Corresp. File, affidavit of M. Soloman, 5/8/78; and Amicus Curiae Opposition to Motion to Strike Brief, 5/16/78.

Tarkanian, UNLV and the NCAA, each for its own reasons, preferred the trial to proceed without the joinder of the NCAA. This course did not serve the interest of justice or comply with the requirement of NRCP 19(a). Remand of the action will, in this case, serve the interest of judicial efficiency by precluding subsequent litigation of the very issues now presented.

We therefore reverse and remand for joinder of the NCAA and further proceedings.

THOMPSON, MANOUKIAN, and BATJER, JJ., concur.

GUNDERSON, J., concurring:

As my colleagues hold, the NCAA is a necessary party to this litigation. Therefore, I agree it was improper for the district court to act in these premises, without requiring the NCAA's joinder. In the absence of such a joinder, however, I also believe there would be no bona fide, justiciable controversy.