## NATIONAL COLLEGIATE ATHLETIC ASSOCIATION
## *v.* TARKANIAN

No. 87–1061.   Argued October 5, 1988—Decided December 12, 1988

*Rex E. Lee* argued the cause for petitioner.   With him on the briefs were *George H. Gangwere, James H. McLarney,* and *Daniel L. Sailler.*

*Samuel S. Lionel* argued the cause for respondent.   With him on the brief were *David N. Frederick* and *Mark A. Solomon.*

JUSTICE STEVENS delivered the opinion of the Court.

When he became head basketball coach at the University of Nevada, Las Vegas (UNLV), in 1973, Jerry Tarkanian inherited a team with a mediocre 14–14 record.   App. 188, 205.   Four years later the team won 29 out of 32 games and placed third in the championship tournament sponsored by the National Collegiate Athletic Association (NCAA), to which UNLV belongs.   *Id.,* at 188.

Yet in September 1977 UNLV informed Tarkanian that it was going to suspend him.   No dissatisfaction with Tarkan-

ian, once described as "the 'winningest' active basketball coach," *id.*, at 19, motivated his suspension. Rather, the impetus was a report by the NCAA detailing 38 violations of NCAA rules by UNLV personnel, including 10 involving Tarkanian. The NCAA had placed the university's basketball team on probation for two years and ordered UNLV to show cause why the NCAA should not impose further penalties unless UNLV severed all ties during the probation between its intercollegiate athletic program and Tarkanian.

Facing demotion and a drastic cut in pay,[1] Tarkanian brought suit in Nevada state court, alleging that he had been deprived of his Fourteenth Amendment due process rights in violation of 42 U. S. C. § 1983.[2] Ultimately Tarkanian obtained injunctive relief and an award of attorney's fees against both UNLV and the NCAA.[3] 103 Nev. 331, 741 P. 2d 1345 (1987) *(per curiam)*. NCAA's liability may be upheld only if its participation in the events that led to

---

[1] The trial court found that Tarkanian, as head basketball coach,

"is annually paid (in lieu of his salary as a professor) $125,000, plus 10% of the net proceeds received by UNLV for participation in NCAA-authorized championship games, plus fees from basketball camps and clinics, product endorsements, and income realized from writing a newspaper column, speaking on a radio program entitled 'THE JERRY TARKANIAN SHOW,' and appearing on a television program bearing the same name." App. 18.

That compensation was "entirely contingent on [Tarkanian's] continued status as the Head Basketball Coach at UNLV." As a tenured professor alone, he would have earned about $53,000 a year, the court found. *Ibid.*

[2] That section provides, in part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[3] The fees were awarded pursuant to 42 U. S. C. § 1988, which authorizes a court in its discretion to award the prevailing party in an action brought under § 1983 a reasonable attorney's fee as a part of the costs.

Tarkanian's suspension constituted "state action" prohibited by the Fourteenth Amendment and was performed "under color of" state law within the meaning of § 1983.[4] We granted certiorari to review the Nevada Supreme Court's holding that the NCAA engaged in state action when it conducted its investigation and recommended that Tarkanian be disciplined. 484 U. S. 1058 (1988). We now reverse.[5]

## I

In order to understand the four separate proceedings that gave rise to the question we must decide, it is useful to begin with a description of the relationship among the three parties—Tarkanian, UNLV, and the NCAA.

Tarkanian initially was employed on a year-to-year basis but became a tenured professor in 1977. He receives an annual salary with valuable fringe benefits, and his status as a highly successful coach enables him to earn substantial additional income from sports-related activities such as broadcasting and the sponsorship of products.

---

[4] In this case the under-color-of-law requirement of 42 U. S. C. § 1983 and the state-action requirement of the Fourteenth Amendment are equivalent. See *Rendell-Baker* v. *Kohn*, 457 U. S. 830, 838 (1982); see also *Lugar* v. *Edmondson Oil Co.*, 457 U. S. 922, 928–935 (1982).

[5] Although the NCAA's status as a state or private actor is a novel issue in this Court, lower federal courts have entertained the question for a number of years. Initially, Federal Courts of Appeals held that the NCAA was a state actor for § 1983 purposes. *E. g.*, *Regents of University of Minnesota* v. *NCAA*, 560 F. 2d 352 (CA8), cert. dism'd, 434 U. S. 978 (1977); *Howard University* v. *NCAA*, 166 U. S. App. D. C. 260, 510 F. 2d 213 (1975); *Parish* v. *NCAA*, 506 F. 2d 1028 (CA5 1975); *Associated Students, Inc.* v. *NCAA*, 493 F. 2d 1251 (CA9 1974) *(per curiam)*. Since our decisions in *Lugar* v. *Edmondson Oil Co.*, *supra*, *Rendell-Baker* v. *Kohn*, *supra*, and *Blum* v. *Yaretsky*, 457 U. S. 991 (1982), all issued on the same day, lower courts have held to the contrary. *E. g.*, *McCormack* v. *NCAA*, 845 F. 2d 1338 (CA5 1988); *Karmanos* v. *Baker*, 816 F. 2d 258 (CA6 1987); *Graham* v. *NCAA*, 804 F. 2d 953 (CA6 1986); *Arlosoroff* v. *NCAA*, 746 F. 2d 1019 (CA4 1984). See *Spath* v. *NCAA*, 728 F. 2d 25, 28 (CA1 1984) (dictum).

UNLV is a branch of the University of Nevada, a state-funded institution. The university is organized and operated pursuant to provisions of Nevada's State Constitution, statutes, and regulations. In performing their official functions, the executives of UNLV unquestionably act under color of state law.

The NCAA is an unincorporated association of approximately 960 members, including virtually all public and private universities and 4-year colleges conducting major athletic programs in the United States. Basic policies of the NCAA are determined by the members at annual conventions. Between conventions, the Association is governed by its Council, which appoints various committees to implement specific programs.

One of the NCAA's fundamental policies "is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body, and by so doing, retain a clear line of demarcation between college athletics and professional sports." App. 80. It has therefore adopted rules, which it calls "legislation," *ibid.*, governing the conduct of the intercollegiate athletic programs of its members. This NCAA legislation applies to a variety of issues, such as academic standards for eligibility, admissions, financial aid, and the recruiting of student athletes. By joining the NCAA, each member agrees to abide by and to enforce such rules.

The NCAA's bylaws provide that its enforcement program shall be administered by a Committee on Infractions. The Committee supervises an investigative staff, makes factual determinations concerning alleged rule violations, and is expressly authorized to "impose appropriate penalties on a member found to be in violation, or recommend to the Council suspension or termination of membership."[6] In particu-

---

[6] App. 98. Among the sanctions that the Committee may impose "against an institution" are:

"(1) Reprimand and censure;

lar, the Committee may order a member institution to show cause why that member should not suffer further penalties unless it imposes a prescribed discipline on an employee; it is not authorized, however, to sanction a member institution's employees directly.[7] The bylaws also provide that representatives of member institutions "are expected to cooperate fully" with the administration of the enforcement program. *Id.*, at 97. The bylaws do not purport to confer any subpoena power on the Committee or its investigators. They state:

> "The enforcement procedures are an essential part of the intercollegiate athletic program of each member institu-

"(2) Probation for one year;

"(3) Probation for more than one year;

"(4) Ineligibility for one or more National Collegiate Championship events;

"(5) Ineligibility for invitational and postseason meets and tournaments;

"(6) Ineligibility for any television programs subject to the Association's control or administration;

"(7) Ineligibility of the member to vote or its personnel to serve on committees of the Association, or both;

"(8) Prohibition against an intercollegiate sports team or teams participating against outside competition for a specified period;

"(9) Prohibition against the recruitment of prospective student-athletes for a sport or sports for a specified period . . . ." *Id.*, at 103–104.

[7] Upon finding that misconduct by an employee of a member institution caused NCAA rules to be violated, the Committee may require the member to "show cause why:

"(i) a penalty or an additional penalty should not be imposed if, in the opinion of the Committee (or Council), it does not take appropriate disciplinary or corrective action against athletic department personnel involved in the infractions case, any other institutional employee if the circumstances warrant, or representatives of the institution's athletic interests; or

"(ii) a recommendation should not be made to the membership that the institution's membership in the Association be suspended or terminated if, in the opinion of the Committee (or Council), it does not take appropriate disciplinary or corrective action against the head coach of the sport involved, any other institutional employee if the circumstances warrant, or representatives of the institution's athletic interests." *Id.*, at 104.

tion and require full and complete disclosure by all institutional representatives of any relevant information requested by the NCAA investigative staff, Committee on Infractions or Council during the course of an inquiry." *Ibid.*

During its investigation of UNLV, the Committee on Infractions included three law professors, a mathematics professor, and the dean of a graduate school. Four of them were on the faculties of state institutions; one represented a private university.

## The NCAA Investigation of UNLV

On November 28, 1972, the Committee on Infractions notified UNLV's president that it was initiating a preliminary inquiry into alleged violations of NCAA requirements by UNLV. As a result of that preliminary inquiry, some three years later the Committee decided that an "Official Inquiry" was warranted and so advised the UNLV president on February 25, 1976. That advice included a series of detailed allegations concerning the recruitment of student athletes during the period between 1971 and 1975. Many of the allegations implicated Tarkanian. It requested UNLV to investigate and provide detailed information concerning each alleged incident.

With the assistance of the Attorney General of Nevada and private counsel, UNLV conducted a thorough investigation of the charges. On October 27, 1976, it filed a comprehensive response containing voluminous exhibits and sworn affidavits. The response denied all of the allegations and specifically concluded that Tarkanian was completely innocent of wrongdoing. Thereafter, the Committee conducted four days of hearings at which counsel for UNLV and Tarkanian presented their views of the facts and challenged the credibility of the NCAA investigators and their informants. Ultimately the Committee decided that many of the charges could not be supported, but it did find 38 violations of NCAA

rules, including 10 committed by Tarkanian. Most serious was the finding that Tarkanian had violated the University's obligation to provide full cooperation with the NCAA investigation.[8] The Committee's findings and proposed discipline were summarized in great detail in its so-called "Confidential Report No. 123(47)." App. 122–204.

The Committee proposed a series of sanctions against UNLV, including a 2-year period of probation during which its basketball team could not participate in postseason games or appear on television. The Committee also requested UNLV to show cause why additional penalties should not be imposed against UNLV if it failed to discipline Tarkanian by removing him completely from the University's intercollegiate athletic program during the probation period. UNLV appealed most of the Committee's findings and proposed sanctions to the NCAA Council. After hearing arguments from attorneys representing UNLV and Tarkanian, the Council on August 25, 1977, unanimously approved the Committee's investigation and hearing process and adopted all its recommendations.

### UNLV's Discipline of Tarkanian

Promptly after receiving the NCAA report, the president of UNLV directed the University's vice president to schedule a hearing to determine whether the Committee's recommended sanctions should be applied. Tarkanian and UNLV were represented at that hearing; the NCAA was not. Although the vice president expressed doubt concerning the sufficiency of the evidence supporting the Committee's findings,[9] he concluded that "given the terms of our adherence to

---

[8] See id., at 141–150, 190, 196.

[9] "Most serious is the charge that Coach Tarkanian attempted to frustrate the NCAA's application of the rules by getting people to 'change their story' or to fabricate bodies of countervailing evidence. I am not convinced that the NCAA investigation adequately supports this charge and yet we must remember that the NCAA infractions committee and the

the NCAA we cannot substitute—biased as we must be—our own judgment on the credibility of witnesses for that of the infractions committee and the Council." *Id.*, at 75. With respect to the proposed sanctions, he advised the president that he had three options:

"1. Reject the sanction requiring us to disassociate Coach Tarkanian from the athletic program and take the risk of still heavier sanctions, *e. g.*, possible extra years of probation.

"2. Recognize the University's delegation to the NCAA of the power to act as ultimate arbiter of these matters, thus reassigning Mr. Tarkanian from his present position—though tenured and without adequate notice—even while believing that the NCAA was wrong.

"3. Pull out of the NCAA completely on the grounds that you will not execute what you hold to be their unjust judgments." *Id.*, at 76.

Pursuant to the vice president's recommendation, the president accepted the second option and notified Tarkanian that he was to "be completely severed of any and all relations, formal or informal, with the University's Intercollegiate athletic program during the period of the University's NCAA probation." *Id.*, at 70.

*Tarkanian's Lawsuit Against UNLV*

The day before his suspension was to become effective, Tarkanian filed an action in Nevada state court for declaratory and injunctive relief against UNLV and a number of its officers. He alleged that these defendants had, in violation of 42 U. S. C. § 1983, deprived him of property and liberty without the due process of law guaranteed by the Fourteenth Amendment to the United States Constitution. Based on a stipulation of facts and the testimony offered by Tarkanian,

NCAA Council, both composed of distinguished scholars, administrators, and lawyers, believed otherwise." *Id.*, at 72.

the trial court enjoined UNLV from suspending Tarkanian on the ground that he had been denied procedural and substantive due process of law. UNLV appealed.

The NCAA, which had not been joined as a party, filed an *amicus curiae* brief arguing that there was no actual controversy between Tarkanian and UNLV; thus, the suit should be dismissed. Alternatively, the NCAA contended that the trial court had exceeded its jurisdiction by effectively invalidating the enforcement proceedings of the NCAA, even though the Association was not a party to the suit. Should a controversy exist, the NCAA argued, it was a necessary party to litigate the scope of any relief. Finally, it contested the trial court's conclusion that Tarkanian had been denied due process. The Nevada Supreme Court concluded that there was an actual controversy but agreed that the NCAA was a necessary party and therefore reversed and remanded to permit joinder of the NCAA. *University of Nevada* v. *Tarkanian*, 95 Nev. 389, 594 P. 2d 1159 (1979).

*The Lawsuit Against NCAA*

Tarkanian consequently filed a second amended complaint adding the NCAA. The defendants promptly removed the suit to Federal District Court on the ground that joinder of the NCAA substantially had altered the nature of the litigation. The District Court held, however, that the original defendants had waived their right to remove the suit when it was first filed, and therefore granted Tarkanian's motion to remand the case to the state court. After a 4-year delay, the trial judge conducted a 2-week bench trial and resolved the issues in Tarkanian's favor. The court concluded that NCAA's conduct constituted state action for jurisdictional and constitutional purposes, and that its decision was arbitrary and capricious. It reaffirmed its earlier injunction barring UNLV from disciplining Tarkanian or otherwise enforcing the Confidential Report. Additionally, it enjoined the NCAA from conducting "any further proceedings against the

University," from enforcing its show-cause order, and from taking any other action against the University that had been recommended in the Confidential Report. App. 34.

Two weeks after the trial court's opinion was entered, Tarkanian filed a petition for attorney's fees pursuant to 42 U. S. C. § 1988. Asserting that this was the first time Tarkanian had claimed relief under § 1988, the NCAA again sought removal to Federal District Court on the ground that the litigation had changed substantially. When the university defendants declined to join the removal petition, the NCAA contended that they should be realigned as plaintiffs because they actually wanted Tarkanian to prevail. The District Court, however, again ordered the litigation remanded, and the Ninth Circuit agreed. App. to Pet. for Cert. A120. Even before the Ninth Circuit ruled, the Nevada trial court had awarded Tarkanian attorney's fees of almost $196,000, 90% of which was to be paid by the NCAA. App. 41–42. The NCAA appealed both the injunction and the fee order. Not surprisingly, UNLV, which had scored a total victory except for its obligation to pay a fraction of Tarkanian's fees, did not appeal.

The Nevada Supreme Court agreed that Tarkanian had been deprived of both property and liberty protected by the Constitution and that he was not afforded due process before suspension. It thus affirmed the trial court's injunction insofar as it pertained to Tarkanian, but narrowed its scope "only to prohibit enforcement of the penalties imposed upon Tarkanian in Confidential Report No. 123(47) and UNLV's adoption of those penalties." 103 Nev., at 343, 741 P. 2d, at 1353. The court also reduced the award of attorney's fees.[10]

---

[10] The court held the NCAA was not liable for fees Tarkanian incurred during the first trial and first appeal to the State Supreme Court. Not only did those events occur before the NCAA was a party to the litigation, the court explained, but since the trial court's judgment was reversed, Tarkanian had not prevailed, and thus was not eligible for fees pursuant to § 1988. In a later opinion, the Supreme Court ordered that Tarkanian be

As a predicate for its disposition, the State Supreme Cour held that the NCAA had engaged in state action. Severa strands of argument supported this holding. First, the cour assumed that it was reviewing "UNLV's and the NCAA's im position of penalties against Tarkanian," *id.*, at 335, 741 P 2d, at 1347, rather than the NCAA's proposed sanction: against UNLV if it failed to discipline Tarkanian appropri ately. Second, it regarded the NCAA's regulatory activitie: as state action because "many NCAA member institution: were either public or government supported." *Ibid.* Third, it stated that the right to discipline a public employee "is tra ditionally the exclusive prerogative of the state" and that UNLV could not escape its responsibility for such discipli nary action by delegating that duty to a private entity. *Id.*, at 336, 741 P. 2d, at 1348. The court next pointed to our opinion in *Lugar* v. *Edmondson Oil Co.*, 457 U. S. 922, 937 (1982), in which we held that the deprivation of a federal right may be attributed to the State if it resulted from a state-created rule and the party charged with the deprivation can fairly be said to a state actor. Summing up its holding that the NCAA's activities constituted state action, the Nevada Supreme Court stated:

> "The first prong [of *Lugar*] is met because no third party could impose disciplinary sanctions upon a state university employee unless the third party received the right or privilege from the university. Thus, the deprivation which Tarkanian alleges is caused by the exercise of a right or privilege created by the state. Also, in the instant case, both UNLV and the NCAA must be considered state actors. By delegating authority to the NCAA over athletic personnel decisions and by imposing the NCAA sanctions against Tarkanian, UNLV acted

---

allowed additional fees for services performed on his second appeal before that court.

jointly with the NCAA." 103 Nev., at 337, 741 P. 2d, at 1349.

## II

Embedded in our Fourteenth Amendment jurisprudence is a dichotomy between state action, which is subject to scrutiny under the Amendment's Due Process Clause,[11] and private conduct, against which the Amendment affords no shield, no matter how unfair that conduct may be. *Shelley* v. *Kraemer*, 334 U. S. 1, 13 (1948); see *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345, 349 (1974). As a general matter the protections of the Fourteenth Amendment do not extend to "private conduct abridging individual rights." *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715, 722 (1961).

"Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law" and avoids the imposition of responsibility on a State for conduct it could not control. *Lugar*, 457 U. S., at 936–937. When Congress enacted § 1983 as the statutory remedy for violations of the Constitution, it specified that the conduct at issue must have occurred "under color of" state law; thus, liability attaches only to those wrongdoers "who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." *Monroe* v. *Pape*, 365 U. S. 167, 172 (1961). As we stated in *United States* v. *Classic*, 313 U. S. 299, 326 (1941):

"Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law."

In this case Tarkanian argues that the NCAA was a state actor because it misused power that it possessed by virtue of

[11] "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U. S. Const., Amdt. 14. § 1.

state law. He claims specifically that UNLV delegated its own functions to the NCAA, clothing the Association with authority both to adopt rules governing UNLV's athletic programs and to enforce those rules on behalf of UNLV. Similarly, the Nevada Supreme Court held that UNLV had delegated its authority over personnel decisions to the NCAA. Therefore, the court reasoned, the two entities acted jointly to deprive Tarkanian of liberty and property interests, making the NCAA as well as UNLV a state actor.

These contentions fundamentally misconstrue the facts of this case. In the typical case raising a state-action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action. This may occur if the State creates the legal framework governing the conduct, *e. g., North Georgia Finishing, Inc.* v. *Di-Chem, Inc.*, 419 U. S. 601 (1975); if it delegates its authority to the private actor, *e. g., West* v. *Atkins,* 487 U. S. 42 (1988); or sometimes if it knowingly accepts the benefits derived from unconstitutional behavior, *e. g., Burton* v. *Wilmington Parking Authority, supra.* Thus, in the usual case we ask whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor.[12]

This case uniquely mirrors the traditional state-action case. Here the final act challenged by Tarkanian—his suspension—was committed by UNLV. A state university without question is a state actor. When it decides to impose a serious disciplinary sanction upon one of its tenured employees, it must comply with the terms of the Due Process Clause of the Fourteenth Amendment to the Federal Constitution. Accord, *Cleveland Board of Education* v. *Louder-*

---

[12] *E. g., Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345, 351 (1974) ("[T]he inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may fairly be treated as that of the State itself").

*mill,* 470 U. S. 532 (1985); *Board of Regents of State Colleges* v. *Roth,* 408 U. S. 564 (1972). Thus when UNLV notified Tarkanian that he was being separated from all relations with the university's basketball program, it acted under color of state law within the meaning of 42 U. S. C. § 1983.

The mirror image presented in this case requires us to step through an analytical looking glass to resolve the case. Clearly UNLV's conduct was influenced by the rules and recommendations of the NCAA, the private party. But it was UNLV, the state entity, that actually suspended Tarkanian. Thus the question is not whether UNLV participated to a critical extent in the NCAA's activities, but whether UNLV's actions in compliance with the NCAA rules and recommendations turned the NCAA's conduct into state action.

We examine first the relationship between UNLV and the NCAA regarding the NCAA's rulemaking. UNLV is among the NCAA's members and participated in promulgating the Association's rules; it must be assumed, therefore, that Nevada had some impact on the NCAA's policy determinations. Yet the NCAA's several hundred other public and private member institutions each similarly affected those policies. Those institutions, the vast majority of which were located in States other than Nevada, did not act under color of Nevada law. It necessarily follows that the source of the legislation adopted by the NCAA is not Nevada but the collective membership, speaking through an organization that is independent of any particular State.[13] Cf. *Allied Tube & Conduit Corp.* v. *Indian Head, Inc.,* 486 U. S. 492, 501

---

[13] The situation would, of course, be different if the membership consisted entirely of institutions located within the same State, many of them public institutions created by the same sovereign. See *Clark* v. *Arizona Interscholastic Association,* 695 F. 2d 1126 (CA9 1982), cert. denied, 464 U. S. 818 (1983); *Louisiana High School Athletic Association* v. *St. Augustine High School,* 396 F. 2d 224 (CA5 1968). The dissent apparently agrees that the NCAA was not acting under color of state law in its relationships with private universities, which constitute the bulk of its membership. See *post,* at 202, n. 2.

(1988) ("Whatever *de facto* authority the [private standard-setting] Association enjoys, no official authority has been conferred on it by any government . . .").

State action nonetheless might lie if UNLV, by embracing the NCAA's rules, transformed them into state rules and the NCAA into a state actor. See *Lugar*, 457 U. S., at 937. UNLV engaged in state action when it adopted the NCAA's rules to govern its own behavior, but that would be true even if UNLV had taken no part in the promulgation of those rules. In *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977), we established that the State Supreme Court's enforcement of disciplinary rules transgressed by members of its own bar was state action. Those rules had been adopted *in toto* from the American Bar Association Code of Professional Responsibility. *Id.*, at 360, n. 12. It does not follow, however, that the ABA's formulation of those disciplinary rules was state action. The State Supreme Court retained plenary power to reexamine those standards and, if necessary, to reject them and promulgate its own. See *id.*, at 362.[14] So here, UNLV retained the authority to withdraw

---

[14] Petitioners in *Bates*, contended that enforcement of disciplinary rules circumscribing attorney advertising violated §§ 1 and 2 of the Sherman Act, 15 U. S. C. §§ 1 and 2, and the First Amendment, made applicable to the States by the Fourteenth Amendment. 433 U. S., at 353. The Court unanimously concluded that state action existed in deciding that by the doctrine enunciated in *Parker* v. *Brown*, 317 U. S. 341 (1943), respondent was immune from Sherman Act liability. The Court reached the merits of petitioners' First and Fourteenth Amendment claims without discussing whether state action existed for Fourteenth Amendment purposes. 433 U. S., at 363–384.

Although by no means identical, analysis of the existence of state action justifying immunity from antitrust liability is somewhat similar to the state-action inquiry conducted pursuant to § 1983 and the Fourteenth Amendment. In both contexts, for example, courts examine whether the rule in question is a rule of the State. Compare *Hoover* v. *Ronwin*, 466 U. S. 558, 569 (1984) ("[T]he Court has required a showing that the conduct is pursuant to a 'clearly articulated and affirmatively expressed state policy' to replace competition with regulation") (citation omitted), with *Lugar*,

from the NCAA and establish its own standards. The university alternatively could have stayed in the Association and worked through the Association's legislative process to amend rules or standards it deemed harsh, unfair, or unwieldy.[15]  Neither UNLV's decision to adopt the NCAA's standards nor its minor role in their formulation is a sufficient reason for concluding that the NCAA was acting under color of Nevada law when it promulgated standards governing athlete recruitment, eligibility, and academic performance.

Tarkanian further asserts that the NCAA's investigation, enforcement proceedings, and consequent recommendations constituted state action because they resulted from a delegation of power by UNLV.  UNLV, as an NCAA member, subscribed to the statement in the Association's bylaws that NCAA "enforcement procedures are an essential part of the intercollegiate athletic program of each member institution." App. 97.  It is, of course, true that a State may delegate authority to a private party and thereby make that party a state actor.  Thus, we recently held that a private physician who had contracted with a state prison to attend to the inmates' medical needs was a state actor.  *West* v. *Atkins,* 487 U. S. 42 (1988).  But UNLV delegated no power to the

---

457 U. S., at 937 ("[T]he deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible").  The degree to which the activities of the state entity and the arguably private entity are intertwined also is pertinent.  Compare *Hoover,* 466 U. S., at 569–570, with *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715, 721–726 (1961).

[15] Furthermore, the NCAA's bylaws permit review of penalties, even after they are imposed, "upon a showing of newly discovered evidence which is· directly related to the findings in the case, or that there was a prejudicial error in the procedure which was followed in the processing of the case by the Committee." App. 107.  UNLV could have sought such a review, perhaps on the theory that the NCAA's investigator was biased against Tarkanian, as the Nevada trial court found in 1984.  *Id.,* at 20. The NCAA Committee on Infractions was authorized to "reduce or eliminate any penalty" if the university had prevailed.  *Id.,* at 108.

NCAA to take specific action against any university employee. The commitment by UNLV to adhere to NCAA enforcement procedures was enforceable only by sanctions that the NCAA might impose on UNLV itself.

Indeed, the notion that UNLV's promise to cooperate in the NCAA enforcement proceedings was tantamount to a partnership agreement or the transfer of certain university powers to the NCAA is belied by the history of this case. It is quite obvious that UNLV used its best efforts to retain its winning coach—a goal diametrically opposed to the NCAA's interest in ascertaining the truth of its investigators' reports. During the several years that the NCAA investigated the alleged violations, the NCAA and UNLV acted much more like adversaries than like partners engaged in a dispassionate search for the truth. The NCAA cannot be regarded as an agent of UNLV for purposes of that proceeding. It is more correctly characterized as an agent of its remaining members which, as competitors of UNLV, had an interest in the effective and evenhanded enforcement of the NCAA's recruitment standards. Just as a state-compensated public defender acts in a private capacity when he or she represents a private client in a conflict against the State, *Polk County* v. *Dodson*, 454 U. S. 312, 320 (1981), the NCAA is properly viewed as a private actor at odds with the State when it represents the interests of its entire membership in an investigation of one public university.[16]

---

[16] Tarkanian argues that UNLV and the NCAA were "joint participants" in state action. Brief for Respondent 42. He would draw support from *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715 (1961), in which a lease relationship between a private restaurant and a publicly owned parking structure entailed "an incidental variety of mutual benefits," *id.*, at 724: tax exemptions for the restaurant, rent payments for the parking authority, and increased business for both. Because of this interdependence, we held, the restaurant and parking authority jointly violated the Fourteenth Amendment when the restaurant discriminated on account of race. *Id.*, at 725. In the case before us the state and private parties' relevant interests do not coincide, as they did in *Burton;* rather, they have clashed through-

The NCAA enjoyed no governmental powers to facilitate its investigation.[17]  It had no power to subpoena witnesses, to impose contempt sanctions, or to assert sovereign authority over any individual.  Its greatest authority was to threaten sanctions against UNLV, with the ultimate sanction being expulsion of the university from membership.  Contrary to the premise of the Nevada Supreme Court's opinion, the NCAA did not—indeed, could not—directly discipline Tarkanian or any other state university employee.[18]  The ex-

out the investigation, the attempt to discipline Tarkanian, and this litigation.  UNLV and the NCAA were antagonists, not joint participants, and the NCAA may not be deemed a state actor on this ground.

[17] In *Dennis* v. *Sparks*, 449 U. S. 24 (1980), on which the dissent relies, the parties had entered into a corrupt agreement to perform a judicial act. As we explained:

"[H]ere the allegations were that an official act of the defendant judge was the product of a corrupt conspiracy involving bribery of the judge.  Under these allegations, the private parties conspiring with the judge were acting under color of state law; and it is of no consequence in this respect that the judge himself is immune from damages liability.  Immunity does not change the character of the judge's action or that of his co-conspirators. Indeed, his immunity is dependent on the challenged conduct being an official judicial act within his statutory jurisdiction, broadly construed.  Private parties who corruptly conspire with a judge in connection with such conduct are thus acting under color of law . . . ."  *Id.*, at 28–29 (footnote and citations omitted).

In this case there is no suggestion of any impropriety respecting the agreement between the NCAA and UNLV.  Indeed the dissent seems to assume that the NCAA's liability as a state actor depended not on its initial agreement with UNLV, but on whether UNLV ultimately accepted the NCAA's recommended discipline of Tarkanian.  See *post*, at 203.  In contrast, the conspirators in *Dennis* became state actors when they formed the corrupt bargain with the judge, and remained so through completion of the conspiracy's objectives.  Cf. *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 149–150, and n. 5 (1970) (private restaurant that denied plaintiff service in violation of federal law would be liable as state actor upon proof that it conspired with police officer to deprive plaintiff of her constitutional rights).

[18] Tarkanian urges us to hold, as did the Nevada Supreme Court, that the NCAA by its rules and enforcement procedures has usurped a tradi-

press terms of the Confidential Report did not demand the suspension unconditionally; rather, it requested "the University . . . to show cause" why the NCAA should not impose additional penalties if UNLV declines to suspend Tarkanian. App. 180. Even the university's vice president acknowledged that the Report gave the university options other than suspension: UNLV could have retained Tarkanian and risked additional sanctions, perhaps even expulsion from the NCAA, or it could have withdrawn voluntarily from the Association.

Finally, Tarkanian argues that the power of the NCAA is so great that the UNLV had no practical alternative to compliance with its demands. We are not at all sure this is true,[19] but even if we assume that a private monopolist can

---

tional, essential state function. Quite properly, he does not point to the NCAA's overriding function of fostering amateur athletics at the college level. For while we have described that function as "critical," *NCAA* v. *Board of Regents of Univ. of Okla.*, 468 U. S. 85, 120 (1984), by no means is it a traditional, let alone an exclusive, state function. Cf. *San Francisco Arts & Athletics, Inc.* v. *United States Olympic Committee*, 483 U. S. 522, 545 (1987) ("Neither the conduct nor the coordination of amateur sports has been a traditional government function"). Tarkanian argues instead that the NCAA has assumed the State's traditional and exclusive power to discipline its employees. "[A]s to state employees connected with intercollegiate athletics, the NCAA requires that its standards, procedures and determinations *become* the State's standards, procedures and determinations for disciplining state employees," he contends. "The State is *obligated* to impose NCAA standards, procedures and determinations making the NCAA a joint participant in the State's suspension of Tarkanian." Brief for Respondent 34–35 (emphases in original).

This argument overlooks the fact that the NCAA's own legislation prohibits it from taking any direct action against Tarkanian. Moreover, suspension of Tarkanian is one of many recommendations in the Confidential Report. Those recommendations as a whole were intended to bring UNLV's basketball program into compliance with NCAA rules. Suspension of Tarkanian was but one means toward achieving that goal.

[19] The university's desire to remain a powerhouse among the Nation's college basketball teams is understandable, and nonmembership in the

impose its will on a state agency by a threatened refusal to deal with it, it does not follow that such a private party is therefore acting under color of state law. Cf. *Jackson*, 419 U. S., at 351–352 (State's conferral of monopoly status does not convert private party into state actor).

In final analysis the question is whether "the conduct allegedly causing the deprivation of a federal right [can] be fairly attributable to the State." *Lugar*, 457 U. S., at 937. It would be ironic indeed to conclude that the NCAA's imposition of sanctions against UNLV—sanctions that UNLV and its counsel, including the Attorney General of Nevada, steadfastly opposed during protracted adversary proceedings—is fairly attributable to the State of Nevada. It would be more appropriate to conclude that UNLV has conducted its athletic program under color of the policies adopted by the NCAA, rather than that those policies were developed and enforced under color of Nevada law.

The judgment of the Nevada Supreme Court is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE WHITE, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE O'CONNOR join, dissenting.

All agree that UNLV, a public university, is a state actor, and that the suspension of Jerry Tarkanian, a public employee, was state action. The question here is whether the NCAA acted jointly with UNLV in suspending Tarkanian and thereby also became a state actor. I would hold that it did.

I agree with the majority that this case is different on its facts from many of our prior state-action cases. As the majority notes, in our "typical case raising a state-action issue, a private party has taken the decisive step that caused the

NCAA obviously would thwart that goal. But that UNLV's options were unpalatable does not mean that they were nonexistent.

harm to the plaintiff." *Ante*, at 192. In this case, however, which in the majority's view "uniquely mirrors the traditional state-action case," *ibid.*, the final act that caused the harm to Tarkanian was committed, not by a private party, but by a party conceded to be a state actor. Because of this difference, the majority finds it necessary to "step through an analytical looking glass" to evaluate whether the NCAA was a state actor. *Ante*, at 193.

But the situation presented by this case is not unknown to us and certainly is not unique. In both *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144 (1970), and *Dennis* v. *Sparks*, 449 U. S. 24 (1980), we faced the question whether private parties could be held to be state actors in cases in which the final or decisive act was carried out by a state official. In both cases we held that the private parties could be found to be state actors, if they were "jointly engaged with state officials in the challenged action." *Id.*, at 27–28.

The facts of *Dennis* are illustrative. In *Dennis*, a state trial judge enjoined the production of minerals from oil leases owned by the plaintiff. The injunction was later dissolved on appeal as having been issued illegally. The plaintiff then filed suit under 42 U. S. C. § 1983, alleging that the judge had conspired with the party seeking the original injunction—a private corporation—the sole owner of the corporation, and the two sureties on the injunction bond to deprive the plaintiff of due process by corruptly issuing the injunction. We held unanimously that under the facts as alleged the private parties were state actors because they were "willful participant[s] in joint action with the State or its agents." 449 U. S., at 27. See also *Adickes, supra*, at 152 (plaintiff entitled to relief under § 1983 against private party if she can prove that private party and police officer "reached an understanding" to cause her arrest on impermissible grounds).

On the facts of the present case, the NCAA acted jointly with UNLV in suspending Tarkanian. First, Tarkanian was suspended for violations of NCAA rules, which UNLV embraced in its agreement with the NCAA. As the Nevada

Supreme Court found in its first opinion in this case, *University of Nevada* v. *Tarkanian,* 95 Nev. 389, 391, 594 P. 2d 1159, 1160 (1979), "[a]s a member of the NCAA, UNLV contractually agrees to administer its athletic program in accordance with NCAA legislation." Indeed, NCAA rules provide that NCAA "enforcement procedures are an essential part of the intercollegiate athletic program of each member institution." App. 97.

Second, the NCAA and UNLV also agreed that the NCAA would conduct the hearings concerning violations of its rules. Although UNLV conducted its own investigation into the recruiting violations alleged by the NCAA, the NCAA procedures provide that it is the NCAA Committee on Infractions that "determine[s] facts related to alleged violations," subject to an appeal to the NCAA Council. *Id.,* at 98, 101. As a result of this agreement, the NCAA conducted the very hearings the Nevada Supreme Court held to have violated Tarkanian's right to procedural due process.[1]

Third, the NCAA and UNLV agreed that the findings of fact made by the NCAA at the hearings it conducted would be binding on UNLV. By becoming a member of the NCAA, UNLV did more than merely "promise to cooperate in the NCAA enforcement proceedings." *Ante,* at 196. It agreed, as the university hearing officer appointed to rule on Tarkanian's suspension expressly found, to accept the NCAA's "findings of fact as in some way superior to [its] own." App. 74. By the terms of UNLV's membership in the NCAA, the NCAA's findings were final and not subject to further review by any other body, *id.,* at 101, and it was for that reason that UNLV suspended Tarkanian, despite concluding that many of those findings were wrong, *id.,* at 76.

---

[1] The NCAA's petition for certiorari challenged the Nevada Supreme Court's holding that the procedures here violated procedural due process. Our grant of the petition, however, was limited solely to the state-action question. I therefore take as a given, although I do not decide, that the hearings provided to Tarkanian were constitutionally inadequate.

In short, it was the NCAA's findings that Tarkanian had violated NCAA rules, made at NCAA-conducted hearings, all of which were agreed to by UNLV in its membership agreement with the NCAA, that resulted in Tarkanian's suspension by UNLV. On these facts, the NCAA was "jointly engaged with [UNLV] officials in the challenged action," and therefore was a state actor.[2] See *Dennis, supra,* at 27–28.

The majority's objections to finding state action in this case were implicitly rejected by our decision in *Dennis.* Initially, the majority relies on the fact that the NCAA did not have any power to take action directly against Tarkanian as indicating that the NCAA was not a state actor. *Ante,* at 195–196. But the same was true in *Dennis:* the private parties did not have any power to issue an injunction against the plaintiff. Only the trial judge, using his authority granted under state law, could impose the injunction.

Next, the majority points out that UNLV was free to withdraw from the NCAA at any time. *Ante,* at 194–195. Indeed, it is true that when considering UNLV's options, the university hearing officer noted that one of those options was to "[p]ull out of the NCAA completely." App. 76. But of course the trial judge in *Dennis* could have withdrawn from his agreement at any time as well. That he had that option is simply irrelevant to finding that he had entered into an

---

[2] The Court notes that the United States Courts of Appeals have, since our decisions in *Rendell-Baker* v. *Kohn,* 457 U. S. 830 (1982), *Lugar* v. *Edmondson Oil Co.,* 457 U. S. 922 (1982), and *Blum* v. *Yaretsky,* 457 U. S. 991 (1982), held unanimously that the NCAA is not a state actor. *Ante,* at 182, n. 5. See *McCormack* v. *NCAA,* 845 F. 2d 1338, 1346 (CA5 1988); *Karmanos* v. *Baker,* 816 F. 2d 258, 261 (CA6 1987); *Graham* v. *NCAA,* 804 F. 2d 953, 958 (CA6 1986); *Arlosoroff* v. *NCAA,* 746 F. 2d 1019, 1021–1022 (CA4 1984). In none of those cases, however, did the courts address the theory before us here. *E. g., McCormack, supra,* at 1346. Indeed, in *Arlosoroff,* on which the subsequent decisions principally rely, the plaintiff was challenging the actions of Duke, a private university. The issue of joint action between the NCAA and a public university would never have arisen in that case.

agreement.   What mattered was not that he could have withdrawn, but rather that he did not do so.

Finally, the majority relies extensively on the fact that the NCAA and UNLV were adversaries throughout the proceedings before the NCAA.   *Ante*, at 196.   The majority provides a detailed description of UNLV's attempts to avoid the imposition of sanctions by the NCAA.   But this opportunity for opposition, provided for by the terms of the membership agreement between UNLV and the NCAA, does not undercut the agreement itself.   Surely our decision in *Dennis* would not have been different had the private parties permitted the trial judge to seek to persuade them that he should not grant the injunction before finally holding the judge to his agreement with them to do so.   The key there, as with any conspiracy, is that ultimately the parties agreed to take the action.

The majority states in conclusion that "[i]t would be ironic indeed to conclude that the NCAA's imposition of sanctions against UNLV—sanctions that UNLV and its counsel, including the Attorney General of Nevada, steadfastly opposed during protracted adversary proceedings—is fairly attributable to the State of Nevada."   *Ante*, at 199.   I agree.   Had UNLV refused to suspend Tarkanian, and the NCAA responded by imposing sanctions against UNLV, it would be hard indeed to find any state action that harmed Tarkanian.   But that is not this case.   Here, UNLV did suspend Tarkanian, and it did so because it embraced the NCAA rules governing conduct of its athletic program and adopted the results of the hearings conducted by the NCAA concerning Tarkanian, as it had agreed that it would.   Under these facts, I would find that the NCAA acted jointly with UNLV and therefore is a state actor.[3]

I respectfully dissent.

---

[3] The NCAA does not argue that, if it is found to be a state actor, the injunction entered against it by the trial court is invalid.   Tr. of Oral Arg. 49.   I therefore express no opinion on that question.