# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-02-00775-CV

**National Collegiate Athletic Association; The University of Texas at Austin; and Patricia Ohlendorf, in her Official Capacity and in her Individual Capacity, Appellants**

**v.**

**Joscelin Yeo, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
### NO. GN200916, HONORABLE PAUL DAVIS, JUDGE PRESIDING

### O P I N I O N

To characterize this as a case presenting a unique fact pattern requiring a decision of first impression would be an understatement. Joscelin Yeo, a world-class swimmer who had competed in two Olympic games before participating in intercollegiate competition in this country, requested equitable relief against her school, The University of Texas at Austin ("UT-Austin")[1] to resolve an ongoing eligibility controversy that threatened to prevent her from competing in the 2002 National Collegiate Athletic Association ("NCAA") women's swimming and diving championship. The NCAA attempted to intervene. The district court struck the NCAA's intervention and granted

---

[1] For purposes of seeking injunctive relief, Yeo joined appellant Patricia Ohlendorf, UT-Austin Vice President for Institutional Relations and Legal Affairs, in both her official and individual capacities. Because Ohlendorf's interests coincide with UT-Austin's, we will continue to refer to them collectively as "UT-Austin."

a temporary restraining order permitting Yeo to swim in the championship meet. After a subsequent hearing on the merits several months later, the trial court granted a permanent injunction preventing UT-Austin from retroactively declaring Yeo ineligible. Now, the NCAA appeals the striking of its intervention, and UT-Austin appeals the permanent injunction. We will affirm.

## BACKGROUND

Joscelin Yeo has been one of the premier athletes of Singapore from the first time she represented her home country in the Olympic games. Mindful of her future swimming career, Yeo decided to attend a university in the United States and to compete in this country at the amateur intercollegiate level. In 1998, Yeo initially enrolled at the University of California at Berkeley ("Cal-Berkeley"), where she was offered a stipend that covered the expense of purchasing her books. After a solid performance in her freshman year, Yeo obtained more generous financial support and in her sophomore season was part of a relay team that achieved a world record. At the end of Yeo's sophomore year, in the Spring of 2000, her coach, Michael Walker, chose to accept a coaching position at UT-Austin.[2] At the time, Walker, in his secondary capacity as a coach for the Singapore Olympic Team, was preparing Yeo to compete in the 2000 Summer Olympic games to be held in Sydney, Australia. Yeo chose to accompany Walker by transferring to UT-Austin. This coincided with her desire to participate in some educational programs available at UT-Austin but not at Cal-Berkeley.

_____

[2] The record indicates that Walker's decision to transfer to UT-Austin created some ill-will and animosity between the two schools and their swimming programs.

2

The NCAA has strict rules regarding transfers. A transfer student from a four-year institution must fulfill "a residence requirement of one full academic year . . . at the certifying institution."[3] NCAA Bylaws, Rule 14.5.5.1. Thus, the rule requires that a transferring student-athlete refrain from athletic competition for two full long-semesters. This rule is subject to various exceptions. *Id.*, Rules 14.5.5.2.1-.10. Under the "One-Time Transfer Exception," a student-athlete may be excused from the residency requirement if: (1) she has not transferred previously from a four-year institution, (2) she was in good academic standing at the former institution, and (3) the former institution does not object to the transfer of the student-athlete. *Id.*, Rule 14.5.5.2.1.10. In Yeo's case, although the transfer institution, Cal-Berkeley, had pledged to do otherwise, it declined to grant Yeo a one-time waiver of the transfer rule. Even though NCAA rules required Cal-Berkeley to provide Yeo with a timely appeal before its faculty appeals committee, *see id.*, Rule 14.5.5.2.10(d), Cal-Berkeley offered a date for the appeal that would have been too late for Yeo to qualify for the 2001 NCAA women's swimming and diving championship. Therefore, because the season would effectively have been over for her at that point, Yeo did not request an appeal at that time and decided instead to sit out the fall and spring semesters of the 2000-2001 swimming season in order to comply with the one-year transfer rule.

During the fall semester of 2000, Yeo was to be a scholarship athlete at UT-Austin; however, she was also to participate in the Sydney Olympics. Because the summer games were to be held in the southern hemisphere, the games actually took place in the middle of UT-Austin's fall

---

[3] A student-athlete transfers to the certifying institution from the transfer institution. *See* NCAA Bylaws, Rule 14.5.5.2.1.

3

semester. Student-athletes are required to maintain a course load equivalent to twelve hours of credit and to maintain satisfactory academic performance. NCAA Bylaws, Rule 14.1.6.2.2.1. Because Yeo did not feel that she could perform in her classes while having to devote so much time to the Olympic games, UT-Austin's athletic department applied for and obtained a waiver of the twelve-hour requirement. *See id.*, Rule 14.1.6.2.2.1.2 ("the Olympic waiver"). The NCAA Division I Academics/Eligibility/Compliance Cabinet Subcommittee on Continuing Eligibility granted the waiver, noting that Yeo would be "eligible for practice, competition, and athletically related financial aid for the fall 2000 term *without being enrolled in any courses at Texas*." (Emphasis added). Attached to the NCAA's decision was an official NCAA Bylaw Interpretation, dated January 14, 1988, stating that for the purposes of the enrollment policy, a student-athlete is considered to be "in residence" if she is granted a waiver and "either competes in intercollegiate competition *or receives institutional financial aid*." (Emphasis added).

After sitting out the entire 2000-2001 swimming season, Yeo began to compete again in the fall of 2001. Both Yeo and UT-Austin believed in good faith that she was eligible to return to competition. After she had competed in four meets, Cal-Berkeley registered a complaint with the Big XII, the athletic conference in which UT-Austin competes, alleging that Yeo had not satisfied the one-year transfer rule because she had not enrolled for a full twelve semester hours of classes during the fall semester of 2000. UT-Austin asked the NCAA for an interpretation of the rules. The NCAA staff determined that, although the Olympic waiver is available as an exception to the twelve-hour minimum enrollment requirement for continued athletic participation, it does not waive the twelve-hour minimum enrollment requirement for the purpose of establishing two long-semesters

4

of residence at the certifying school.[4]  Under this interpretation, a student-athlete such as Yeo could never enter Olympic competition during a long semester under an Olympic waiver and simultaneously satisfy the one-year transfer rule without sitting out *three* full semesters rather than two, resulting in a full one-and-a-half years of absence from NCAA competition.[5]

In light of the NCAA's interpretation, on November 26, 2001, UT-Austin declared Yeo to be ineligible for competition.  According to the testimony of Christine Plonsky, the women's athletic director at UT-Austin, the school believed it would have better luck declaring Yeo ineligible and applying for reinstatement rather than challenging the NCAA staff's rule interpretation.  Thus, without consulting Yeo, UT-Austin opted to declare her ineligible and rely on the reinstatement process as the only means to restore her eligibility.  The importance of this decision cannot be overemphasized.  Under NCAA rules, following a member-institution's declaration of ineligibility, the reinstatement process is a matter of *grace* rather than a matter of *right*.  From November 26, 2001, forward, Yeo's only remedy was an appeal to the NCAA's institutional compassion.

In reporting to the NCAA its declaration that Yeo was ineligible, UT-Austin's compliance coordinator Leroy Sutherland represented to the NCAA that the university had made the mistake and that, because Yeo was innocent of any wrongdoing, no penalty should attach to her

---

[4]  The timing of this rule interpretation could not have been worse for Yeo.  In October 2000, the NCAA had issued a directive to its staff to deny any eligibility waivers for transfers made for athletic reasons.

[5]  Although requested to do so, the NCAA has been unable to cite any precedent for this interpretation.

personally.[6]  On November 30, 2001, the NCAA denied Sutherland's appeal for leniency and determined that UT-Austin should suspend Yeo from competing in four swim meets in the Spring of 2002, in order to make up for the four meets in which she had competed improperly in the Fall. UT-Austin chose to enforce the penalty.  It was only when Yeo's coaches informed her that she would be forced to miss the first four meets of 2002 that she received notice of the eligibility problem or any indication that her eligibility was in question.

Just prior to the start of the spring season, UT-Austin added additional swim meets to its schedule in which Yeo did not participate.  UT-Austin represented to Yeo that these meets, which included an "Orange-White" meet,[7] two facsimile meets,[8] and a meet with the University of Houston, would qualify to satisfy her four-meet penalty.  In making this decision, the UT-Austin compliance staff appears to have consulted with the NCAA's professional staff about using these meets to fulfill Yeo's required suspension.  Despite this consultation, the NCAA would later determine that, under its definition of "competition," the Orange-White and facsimile meets did not suffice.

In the meantime, Cal-Berkeley filed another complaint regarding Yeo's eligibility based on her failure to meet the requirements of the four-meet penalty.  UT-Austin immediately held Yeo out of competition in two additional meets.  As early as February 22, 2002, UT-Austin was

---

[6]  We recognize that UT-Austin has subsequently improved its eligibility compliance program in an attempt to prevent student-athlete eligibility problems in the future.

[7]  Apparently, this was an intra-squad event.

[8]  Facsimile meets involve two swim teams swimming in different pools at different locations.  The times are compared in order to determine the results.

aware that Yeo's eligibility was in question but again did not notify Yeo of this fact. On March 6, 2002, the NCAA handed down a staff decision holding that the meets in question did not qualify to fulfill Yeo's suspension.[9] The NCAA staff ruled that Yeo would have to sit out of the next three competitions, including the 2002 NCAA women's swimming and diving championship.

UT-Austin appealed the March 6 ruling through an expedited procedure. At about 9:00 p.m. on March 6, Yeo learned for the first time that there was a continuing problem with her eligibility. UT-Austin's compliance staff told her that the appeal would be considered by telephone conference the next morning, March 7, at 9:30 a.m.. Yeo had an academic test scheduled for the same time as the hearing, and another academic test later that day. Yeo never received copies of any of the NCAA determinations or any information regarding the rules under which her case was to be decided. Significantly, Yeo did not learn that she had the right to retain counsel. Furthermore, Yeo was not told that the March 7 hearing would be nonappealable. Yeo was instructed by the UT-Austin staff to make a plea for sympathy. Playing on sympathy was the only strategy employed by UT-Austin; the UT-Austin representatives did not discuss any NCAA precedent or previous practices in pleading Yeo's case. As Yeo put it during the hearing, "I'm surprised and I'm confused, and I don't know what's going on, but there always seems to be something wrong." The NCAA upheld the staff decision.

At this point, UT-Austin recommended that Yeo seek independent legal counsel. On March 11, Yeo's newly retained counsel contacted the authorities at Cal-Berkeley to attempt to

---

[9] There is some indication in the record that Yeo had sat out of at least one additional qualifying meet, but that for unknown reasons the NCAA did not take this meet into consideration.

7

appeal its refusal to grant Yeo her one-time transfer exception. With counsel's assistance, Yeo prevailed upon Cal-Berkeley to relent and grant the requested waiver. Had the same waiver been obtained by UT-Austin at an earlier time, when Yeo originally transferred to UT-Austin or immediately when UT-Austin learned about her eligibility problems, there would likely have been no eligibility issue. The NCAA, however, refused to review its determination or adjust the penalty it had assessed against Yeo even in light of Cal-Berkeley's changed position. According to the NCAA, the March 7 telephone hearing had been Yeo's final opportunity to make her case and the newly acquired waiver did not satisfy the threshold requirements for reconsideration by the committee.

Yeo's upcoming participation in the NCAA meet had already been well-publicized, and she was concerned that if she were suddenly declared ineligible it would harm her reputation as an athlete. With the NCAA meet approaching, on March 20 Yeo filed this declaratory judgment action against UT-Austin requesting ancillary injunctive relief, including a temporary restraining order, on the ground that by denying Yeo an opportunity to protect her vested interest in her established athletic reputation UT-Austin had violated the Texas Constitution's due course of law provision and, therefore, UT-Austin's declaration of ineligibility could not be enforced. Because UT-Austin had not yet put Yeo on the ineligible list, the temporary restraining order was designed to prevent it from declaring her ineligible. The NCAA immediately attempted to intervene, claiming that the temporary order would affect its interest in the enforcement of its eligibility rules.

Yeo moved to strike the NCAA's intervention on the ground that the complaint had been filed only against UT-Austin regarding its procedural administration of the NCAA's rules,

8

rather than against the substance of the NCAA eligibility rules themselves. On March 21, the trial court heard argument on the motion to strike at the same time it heard arguments regarding the temporary restraining order, but no record was made of that hearing and there is no record of any objection to the failure to make a record. The trial court granted Yeo's motion to strike the NCAA's intervention and granted the temporary restraining order, thereby allowing her to swim in the championship meet.

The next morning, March 22, the day of the 2002 NCAA meet, the NCAA filed an expedited petition for writ of mandamus in this Court, asserting that the trial court had abused its discretion in striking the NCAA's intervention. At the same time, UT-Austin filed an interlocutory appeal of the temporary restraining order. That same afternoon, this Court denied the NCAA's petition, *In re Nat'l Collegiate Athletic Ass'n,* No. 03-02-00143-CV (Tex. App.—Austin Mar. 22, 2002) (orig. proceeding), and dismissed UT-Austin's appeal for want of jurisdiction. *University of Tex. v. Yeo*, 03-02-00144-CV (Tex. App.—Austin Mar. 22, 2002, no pet.). Yeo participated in the entire 2002 NCAA championship meet.

From the issuance of the original temporary restraining order on March 21, 2002, until the hearing on the permanent injunction, on October 14, 2002, the NCAA took no positive action on the record. At the permanent injunction hearing, the court heard testimony from several witnesses and argument from counsel. Yeo took the position that her interest in protecting her professional athletic reputation had been compromised by UT-Austin's failure to provide her with notice and adequate procedural safeguards in approaching her eligibility difficulties. Yeo argued that, because the actual process of punishing individual student-athletes is UT-Austin's

9

responsibility, rather than the NCAA's, she could properly seek permanent injunctive relief to prevent the school from retroactively declaring her ineligible based on UT-Austin's earlier failure to provide her with due process. UT-Austin responded that Yeo had no protected interest in participating in college athletics and that, even if she were found to have such an interest, the appropriate remedy was to remand for a new proceeding, not to issue an injunction. The trial court found in Yeo's favor and entered a permanent injunction.

Throughout this eligibility controversy involving the NCAA and two of its member-institutions, the one clear and undisputed fact revealed by this record is that Joscelin Yeo is entirely blameless for any of the eligibility problems that subjected her to eligibility sanctions.

## DISCUSSION

This appeal involves two distinct legal issues raised by two distinct appellants. The NCAA challenges the striking of its intervention. Based on what it claims were procedural irregularities, the NCAA argues that it was denied the chance to intervene in order to protect its interest in enforcing its eligibility rules. UT-Austin appeals the grant of the permanent injunction in Yeo's favor. UT-Austin argues that Yeo is not entitled to relief because her interest in competing in intercollegiate athletics is not a property interest meriting the protection of the due course of law provision of the Texas Constitution.

### The NCAA's Attempted Intervention

In order to understand the posture of the NCAA's appeal, we must address the enforcement structure by which the NCAA promulgates and maintains its eligibility rules. The

10

NCAA does not directly enforce its eligibility rules on students and coaches; rather, it enforces penalties against its member-institutions, which in turn are responsible for meting out penalties to individual athletes and coaches. *See NCAA v. Tarkanian*, 488 U.S. 179, 195 (1988). The NCAA is a voluntary, unincorporated association of educational institutions dedicated to promoting amateur intercollegiate athletics. Its goals include the promotion of athletic competition, the regulation of eligibility with a view to promoting "scholarship, sportsmanship, and amateurism," and the legislative regulation of matters of general concern to the membership. NCAA Constitution, art. 1.2(c). A core principle of the NCAA is "to uphold the principle of institutional control of, and responsibility for, all intercollegiate sports." *Id.*, art. 1.2(b).

The athletic programs of the member-institutions are governed by NCAA regulations, which are adopted by the association through a representative process. The board of directors for Division I, the division to which Cal-Berkeley and UT-Austin belong, is composed of the chief executive officers of member-institutions and is responsible for establishing and directing the relevant bylaws and rules. The board of directors may delegate legislative powers to a Division I Management Council, which comprises athletic administrators of the various member-institutions, including faculty representatives, athletic directors, and senior women administrators. The management council's decisions are subject to ratification by the board of directors. According to the NCAA's constitution, member-institutions have the power to change rules and influence NCAA policy through this legislative process.

Member-institutions are subject to any NCAA penalties resulting from their failure to enforce the rules. *See Tarkanian*, 488 U.S. at 195. Indeed, the NCAA has no direct procedural

11

power to enforce its rules on individuals. *Id.* Member-institutions, at least in theory, reserve the right to secede from the NCAA and establish their own eligibility standards or to work to change NCAA policy through the legislative process. *Id.* Because the legislative process creates rules based on the participation of many institutions from many states, speaking for the collective membership through a non-governmental organization, the rules are not considered to constitute state action, even when applied by public educational institutions. *Id.*

Texas Rule of Civil Procedure 60 states that: "Any party may intervene by filing a pleading, subject to being stricken out by the court for sufficient cause on the motion of any party." Tex. R. Civ. P. 60. Once an intervenor files its motion, any other party to the litigation may put the intervening party to the burden of proving its interest by filing a legally sufficient motion to strike. *See Guaranty Fed. v. Horseshoe Operating*, 793 S.W.2d 652, 657 (Tex. 1990); *Mendez v. Brewer*, 626 S.W.2d 498, 499 (Tex. 1982) ("the intervenor bears the burden to show a justiciable interest . . . in the lawsuit"). The motion to strike need not be accompanied by supporting evidence, but if evidence is attached the intervening party must have sufficient opportunity to explain and show proof of its interest in the lawsuit. *See National Union Fire Ins. Co. v. Pennzoil Co.*, 866 S.W.2d 248, 250 (Tex. App.—Corpus Christi 1993, no writ). A person or entity may intervene if that party could have brought or defeated recovery on the underlying action had it been acting in its own right. *Guaranty Fed.*, 793 S.W.2d at 657. The interest asserted may be legal or equitable. *Id.* Although the trial court has broad discretion in determining whether an intervention should be struck, it is an abuse of discretion to strike a plea in intervention if: (1) the intervenor meets the above test, (2) the

intervention will not complicate the case by an excessive multiplication of the issues, and (3) the intervention is almost essential to effectively protect the intervenor's interest. *Id.*

The motions to intervene and for temporary restraining order were considered together in an accelerated proceeding the day before the NCAA swim meet. For reasons that are not clear from the appellate record, no record of the trial proceedings was made. For the purposes of this appeal, the parties have only presented us with those pleadings that are properly in the appellate record. To preserve error on appeal, a party must present to the trial court a timely request, motion, or objection, state the specific grounds therefore, and obtain a ruling that appears in the record. Tex. R. App. P. 33.1(a); *Wal-Mart Stores, Inc. v. McKenzie*, 997 S.W.2d 278, 280 (Tex. 1999). To preserve factual error that does not appear on the face of the record, an appellant is required to make a formal bill of exception within thirty days of filing the notice of appeal. Tex. R. App. P. 33.2. Because the NCAA has failed to make a record that preserved its objections to the trial court's rulings, we must presume that any discussion or evidence at the March 21 hearing provides no support for overruling the trial court's determination. *Feldman v. Marks*, 960 S.W.2d 613, 614 (Tex. 1996); *Land v. A.T.&S. Transp.*, 947 S.W.2d 665, 668 (Tex. App.—Austin 1997, no writ).

The NCAA attempted to remedy its failure to preserve an adequate record by requesting findings of fact and conclusions of law regarding the decision to strike its motion in intervention. The trial court instead issued findings of fact and conclusions of law regarding the permanent injunction. Having fulfilled the filing requirements for challenging a failure to issue findings of fact, the NCAA now attempts to argue that the failure to issue findings of fact on the motion to strike its intervention constitutes reversible error. Although a failure to issue findings of

13

fact in a bench trial is reversible error regarding any *ultimate issue* of fact that would otherwise go to the jury, *see Birnbaum v. Alliance of Amer. Insurers*, 994 S.W.2d 766, 782 (Tex. App.—Austin 1999, pet. denied), findings of fact are not required on determinations that do not involve ultimate factual conclusions. *Lusk v. Service Lloyds Ins. Co.*, 922 S.W.2d 647, 648 (Tex. App.—Austin 1996, writ denied) (findings of fact required only after evidentiary hearing or bench trial on merits); *Southwest Airlines Co. v. Texas High-Speed Rail Auth.*, 863 S.W.2d 123, 126 (Tex. App.—Austin 1993, writ denied) (findings of fact not required in cases disposed of on pleadings); *Texas Dep't of Mental Health & Mental Retardation v. Petty*, 778 S.W.2d 156, 160 (Tex. App.—Austin 1989, writ dism'd w.o.j.) (trial court need not file findings of fact and conclusions of law in connection with interlocutory orders). Because the motion to strike was an interlocutory order that involved no underlying fact question that would otherwise have gone to a jury, the NCAA was not entitled to findings of fact regarding the decision to strike its intervention, and the trial court's failure to issue them was not reversible error.

Although we are required to presume that the hearing does not support the NCAA's position, we may determine whether the trial court abused its discretion in striking the NCAA's intervention based on the sufficiency of the pleadings. *See Pennzoil*, 866 S.W.2d at 250. The NCAA's notice of intervention simply recites the standard for evaluating interventions and argues that Yeo's lawsuit and requested relief "directly implicate NCAA regulations regarding eligibility for athletic participation and the integrity of intercollegiate competition." An affidavit taken from Julie Roe, an NCAA official, describes the structure and function of the NCAA's eligibility decision-making apparatus and asserts that Yeo and UT-Austin violated the eligibility rules and failed to meet

14

the NCAA's requirements for reinstatement. Roe further asserts that, as a result of Yeo's lawsuit, "the NCAA membership's authority to draft essential eligibility criteria (and maintain standards of scholarship, sportsmanship and amateurism) will be substantially weakened." Roe also alleged that the outcome could disturb uniformity of the NCAA's enforcement of its rules.

Yeo's motion to strike replied that: (1) allowing the NCAA to intervene would unduly complicate the litigation; (2) Yeo did not challenge the NCAA's rules, but the conduct of UT-Austin in applying those rules; and (3) as demonstrated by the NCAA's constitutional structure and the United States Supreme Court's explanation of that structure in *Tarkanian*, the NCAA has delegated direct administration of its rules against student-athletes to member-institutions such as UT-Austin. Essentially, Yeo made the argument that the NCAA's intervention would complicate the time-sensitive disposition of the temporary restraining order because the general application and enforcement of rules is a distinct legal issue from UT-Austin's procedural application of those rules to its own student-athletes.

The trial court faced a time-sensitive decision; the meet was due to start early the next morning. The court may well have determined that the NCAA's intervention would add an additional and perhaps collateral issue to the timely disposition of the temporary restraining order. Additionally, because the NCAA concedes that it would not be able to bring direct legal recourse against Yeo as an individual, the trial court had sufficient reason to believe that intervention in Yeo's litigation was not essential to protecting the NCAA's interests. In reviewing a trial court's actions for abuse of discretion, we are not to substitute our own judgment for that of the trial court but to determine whether the trial court acted in an arbitrary or unreasonable manner without reference to

15

any guiding rules or principles. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002); *Bowie Mem'l Hosp. v. Wright*, 79 S.W.2d 38, 41 (Tex. 2002) (reviewing court may not substitute its judgment for that of trial court). Yeo's argument provided a rationale for striking the NCAA's intervention that is consistent with controlling Texas Supreme Court precedent; nowhere in the record did the NCAA establish a direct interest in Yeo's lawsuit. Furthermore, the NCAA made no subsequent attempt to again intervene in the case and filed nothing with the trial court until its request for findings of fact and conclusions of law. Based on this scant record, we cannot say that, based solely on the pleadings available to the trial court at the March 21 hearing, the court abused its discretion in striking the NCAA's intervention. We overrule the NCAA's issue.

**The Permanent Injunction Against UT-Austin**

The Texas Constitution provides:

> No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

Tex. Const. art. I, § 19. While the Texas version differs somewhat from the United States Constitution's guarantee of "due process," both documents protect the same legal interests without meaningful distinction. *See University of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995); *Mellinger v. City of Houston*, 3 S.W. 249, 252-53 (Tex. 1887). Although we are not bound by federal due process jurisprudence, in each case we are to consider federal interpretations of procedural due process to be persuasive authority in applying the guaranteed due course of law. *See, e.g.*, *Spring Branch Indep. Sch. Dist. v. Stamos*, 695 S.W.2d 556, 560-61 (Tex. 1985) (adopting

16

position of federal courts and majority of state courts that high school students have no *per se* due process interest in extracurricular activities).

Our review of Yeo's due course of law claim requires a two-step analysis: (1) we must determine whether Yeo had a property or liberty interest entitled to due course of law protection; and (2) if so, we must determine what process is due. *Than*, 901 S.W.2d at 929 (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982)).

### *Protected Interest*

Procedural due process is necessary when a property or liberty interest protected under article I, section 19, is threatened by government action. *Than*, 901 S.W.2d at 929. In describing property interests, the courts have tended to discuss the degree to which the government's action regarding property is restricted by operation of state law. *See Grounds v. Tolar Indep. Sch. Dist.*, 856 S.W.2d 417, 419-20 (Tex. 1993) (government employees' entitlement to continued employment based on degree to which statute restricted government's discretion to fire them). The United States Supreme Court has stated that a liberty interest:

> [D]enotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of one's own conscience and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.

*Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972) (citing *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). Reputation plays an important role in this calculation; when a person's good

17

name, reputation, honor, or integrity is at stake because of what the government is doing to her, due process protections are more likely to apply. *See Goss v. Lopez*, 419 U.S. 565, 574-75 (1975) (high school students stood to lose protected interest in their standing with fellow students and their ability to gain post-graduation education and employment); *Roth*, 408 U.S. at 573 (reputational concerns important to extension of due process protections to tenured government employees).[10]

In connection with the permanent injunction, the trial court made several material findings of fact that are essentially unchallenged: (1) Yeo had already established a world-class reputation and her "good name, outstanding reputation, high standing in her community, her unblemished integrity and honor are particularly important in the Republic of Singapore and in light of her cultural background"; (2) if NCAA rules did not prohibit athletes from accepting professional compensation while competing in NCAA sanctioned events, Yeo "would be immediately eligible to capitalize on her public persona by entering into lucrative endorsement and marketing opportunities as well as being eligible for prize winnings due to her performance as a member of Singapore's national team"; and (3) "UT-Austin represented to [Yeo] at the time she transferred from [Cal-Berkeley] to become a student-athlete at UT-Austin that UT-Austin would not jeopardize or compromise [Yeo's] eligibility to compete on behalf of UT-Austin in NCAA athletic competition."

---

[10] Depending on the factual circumstances, some courts have referred to an individual's interest in their professional or academic reputation as a liberty interest, *see University of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995) (interest in professional medical education is a liberty interest), while others have focused on it as a property interest, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972) (stating that government employees have property interest in employment if entitled to certain degree of job security). For convenience, we will refer to a "protected interest" in discussing Yeo's claim to due process protection.

18

These findings of fact support Yeo's theory that her athletic reputation and the accompanying potential income, which was established *even before* she began attending Cal-Berkeley and competing under NCAA regulations, constitutes a protected interest for purposes of due course of law. Yeo had competed in two Olympic games before attending college and had been named sportswoman of the year and Olympic flag-bearer for her native country, Singapore. At both the temporary restraining order and permanent injunction hearings, Yeo represented that it was this continuing interest in her athletic and professional reputation that UT-Austin had damaged by its actions.

UT-Austin attempts to recharacterize Yeo's due course of law argument as a claim that every college student has a due process right to *compete* in intercollegiate athletics. It then seeks to rebut this right to compete by relying on the Texas Supreme Court's declaration in *Spring Branch Independent School District v. Stamos* that "students do not possess a constitutionally protected interest in their participation in extracurricular activities." 695 S.W.2d 556, 561 (Tex. 1985). UT-Austin further relies on a line of cases from the 1970's and 80's establishing that high school students have no protected interest in athletic participation. *See, e.g.*, *Maroney v. University Interscholastic League*, 765 F.2d 403, 406 (5th Cir. 1985); *Hardy v. University Interscholastic League*, 759 F.2d 1233, 1234 (5th Cir. 1985); *Niles v. University Interscholastic League*, 715 F.2d 1027, 1031 (5th Cir. 1983); *Mitchell v. Louisiana High Sch. Athletic Ass'n*, 430 F.2d 1155, 1158 (5th Cir. 1970). UT-Austin's reliance on these cases is misplaced because it mischaracterizes Yeo's primary complaint. While Yeo has an obvious desire to participate in intercollegiate athletics, her

19

Texas constitutional claim is premised upon her already established athletic reputation. Yeo maintains that UT-Austin's decision to declare her ineligible without any due course of law protection prevented her from protecting her interest in her athletic career. Thus, Yeo takes the position that the protected interest of constitutional dimension presented by this case is not her right to participate in intercollegiate athletics generally, but rather the right to protect her reputation and good name that would be adversely affected by a declaration of ineligibility made without an opportunity to be heard.

We recognize that interference by the courts in athletic eligibility determinations, if unfettered, would impede the efficient administration of academic and extracurricular programs and undercut the credibility of athletic competition and academic preparedness. We reaffirm that there is no constitutionally protected interest in extracurricular participation *per se*. *See Stamos*, 695 S.W.2d at 561. However, the fact that courts have traditionally refrained from interfering with the substantive policies established by academic institutions and organizations does not insulate such institutions and organizations from judicial review under all factual circumstances. *See Goss*, 419 U.S. at 574-84; *Than*, 901 S.W.2d at 930-33.

The Texas Supreme Court has recognized a similar protected interest in a medical student faced with "not only serious damage to his reputation but also the loss of his chosen profession as a physician." *University of Texas Med. School v. Than*, 901 S.W.2d 926, 930 (Tex. 1995). Allan Than was a medical student accused of looking at another student's paper while taking his board exams during his third year of medical school. Based upon a statistical comparison of

Than's test paper to another student from whom he had allegedly been copying answers, the medical school instituted disciplinary proceedings against him and offered him a hearing, which Than complained had provided insufficient protection of his legal interests. In part because the "stigma" of being labeled a cheater was "likely to follow the student and preclude him from completing his education at other institutions," the supreme court determined that Than had a protected interest in his graduate education entitled due course of law protection. *Id.*

*Than* stands for the proposition that there can be a protected interest in a student's prospective career under certain circumstances. The supreme court rejected the argument that Than's interest in his medical career was too speculative because he had no medical degree and could not even establish to a certainty the existence of a future medical career. Here, as in *Than*, UT-Austin questions the existence of Yeo's interest in a prospective swimming career. But Yeo's case is factually stronger than that presented in *Than*. Yeo presented testimony from multiple witnesses indicating that she had established a reputation as a world-class athlete that qualified her for significant endorsement and other pecuniary opportunities in her home country of Singapore *separate and apart from her intercollegiate swimming career*. As a result, much of her reputation had been built outside of the United States and the structure of NCAA intercollegiate athletics. We cannot say that the trial court erred in holding that Yeo had a protected interest under these facts.

UT-Austin, joined by various *amici curiae*, contends that an affirmance in this case will create a protected interest in every intercollegiate student-athlete to participate in athletic events. We reject this argument and note that we reach this decision because of the unique fact pattern with

21

which we are presented. Based upon the largely undisputed findings of fact, Yeo had already established a protected interest in her reputation as an athlete long before she came to this country to swim competitively as a student-athlete under NCAA rules. Our holding that Yeo, under these facts, has a protected interest should not be read as extending that same protection to every other intercollegiate athlete. The determination of whether a student-athlete has a protected interest is necessarily fact-specific, depending on that athlete's specific situation and reputation. Each such case must be decided on its own merits, in light of the financial realities of contemporary athletic competition. We hold that Yeo's established interest in her athletic career is entitled to due course of law protection and we affirm the trial court's decision in that regard.

### *Due Process/Due Course of Law*

Having determined that Yeo holds a protected interest, we must now determine the degree of process to which she is entitled. Due process, at a minimum, requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Than*, 901 S.W.2d at 930; *House of Tobacco, Inc. v. Calvert*, 394 S.W.2d 654, 657-58 (Tex. 1965). The process due is measured by a flexible standard depending on the practical requirements of the circumstances. *Mathews*, 424 U.S. at 334; *Goss*, 419 U.S. at 578.

UT-Austin contends that the various reinstatement procedures provided by the NCAA by which UT-Austin attempted to restore Yeo's eligibility constitute adequate process to protect Yeo's rights. After UT-Austin declared Yeo ineligible, it made direct appeals to the appropriate NCAA rulemaking committees and obtained a telephone hearing with the NCAA to ask for

22

reinstatement of Yeo's eligibility, albeit as a matter of grace rather than of right. Procedural due process only ensures that government decisions will be made with sufficient procedural safeguards; it does not insulate an individual from mistakes or inefficiencies. *Than*, 901 S.W.2d at 931. UT-Austin argues that its sponsorship of Yeo in these proceedings, even if ineffective, was sufficient to protect her rights. We disagree.

Yeo would never have had to take part in the NCAA reinstatement process absent UT-Austin's November 26, 2001, determination that she was ineligible. There is no record of how the decision was made. It is clear, however, that Yeo was given no notice of the decision and no opportunity to participate in its making.

In making the November 26 decision, UT-Austin faced a dilemma. NCAA member-institutions play different, and sometimes conflicting, roles in the enforcement of the NCAA's eligibility rules. *See Tarkanian*, 488 U.S. at 194-95. As an advocate for its student-athlete, UT-Austin could have challenged the NCAA's rule interpretation, petitioned Cal-Berkeley and perhaps obtained a one-time transfer waiver, or at least requested that the NCAA grant a waiver of the transfer rule. However, as the enforcement arm of the NCAA, UT-Austin faced potentially stiff penalties if it failed immediately to declare Yeo ineligible. Furthermore, as a member-institution of the NCAA, UT-Austin knew that member-institutions that take positions adverse to the NCAA's official position risk drawing negative attention to their other athletic programs. *See id.* at 195, 198 (member-institutions that disagree with the NCAA may have to withdraw their entire athletic program from NCAA competition). Despite knowing the impact ineligibility would have on Yeo's

23

continuing athletic career, UT-Austin did not inform Yeo that it was making this eligibility decision nor did it suggest that she obtain representation of counsel to protect her interests. No one suggested to her at that time that she could avoid the entire controversy by obtaining a waiver from Cal-Berkeley. Ultimately, UT-Austin's decision to declare Yeo ineligible relegated her from that point forward to seeking grace and forgiveness from the NCAA for an alleged infraction for which she was not responsible.

UT-Austin made a strategic decision to forego other means of protecting Yeo's interests in favor of declaring her ineligible and relying on the reinstatement process as the sole means to preserve Yeo's eligibility. Even through the reinstatement process, however, UT-Austin's attempted compliance with Yeo's four-meet penalty ultimately failed to protect her interests. When UT-Austin's attempt to add additional meets to the spring schedule failed, UT-Austin compounded its earlier miscalculation by again failing to notify Yeo about the eligibility dispute until the process was almost complete. Again, UT-Austin failed to suggest that Yeo retain counsel until after the NCAA had made its final determination in her case. Although UT-Austin endeavored in good faith to reinstate Yeo's eligibility, it failed to give her notice or take into account her interest in participating in the decision-making process. Had retained counsel for Yeo been given the opportunity to assess the situation early in the process, the waiver eventually obtained from Cal-Berkeley might well have salvaged Yeo's eligibility. In effect, UT-Austin's strategic decision, arrived at unilaterally and without Yeo's participation, became determinative.

At a minimum, due course of law regarding a disciplinary decision requires oral or written notice of the charges against the student and, if the student denies them, an explanation of

24

the evidence on which the authorities will rely in making a final determination. *See Than*, 901 S.W.2d at 931. Furthermore, due process generally involves a *meaningful* opportunity to be heard. It is not the NCAA reinstatement process that failed Yeo, but the fact that important decisions regarding her eligibility were made by UT-Austin without notice that a problem existed and with no opportunity for Yeo to advocate for her own position. Under *Mathews*, we assess due process based on three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews*, 424 U.S. at 335. We have already discussed the scope of Yeo's interest in her swimming career. While UT-Austin's decision-making process is not clear from the record, the record is clear that Yeo was not allowed to participate in crucial decisions. UT-Austin does not contend that Yeo's participation would have unduly complicated its internal decision-making process. Because Yeo's rights were being determined with little or no input on her part by an institution faced with multiple competing interests in dealing with NCAA eligibility questions, Yeo's due process rights were compromised.

This does not mean that UT-Austin was required to give Yeo a formal hearing; rather, she should have been afforded notice and an opportunity to communicate with officials through an "informal give-and-take" before the determinative decision was made. *See Goss*, 419 U.S. at 578. We hold that UT-Austin should have afforded Yeo notification and an opportunity to consult with

the UT-Austin compliance staff before the initial eligibility decision. We overrule UT-Austin's issue.

The trial court also awarded Yeo attorney's fees based on her declaratory judgment action.[11] The Uniform Declaratory Judgment Act waives the state's sovereign immunity and provides that the trial court may, in its discretion, award attorney's fees to the prevailing party. Tex. Civ. Prac. & Rem. Code Ann. §§ 37.004, .006 (West 1997); *Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex. 1994). We affirm the attorney's fee award.

### CONCLUSION

This case involves an eligibility decision made by a government entity, UT-Austin, regarding its position on the eligibility of a student-athlete to participate in intercollegiate competition. We affirm the trial court's decision, exercising its discretion, to strike the NCAA's plea in intervention, because the record provided to this court does not establish the NCAA as a necessary party.

Not every student-athlete has a protected interest in their athletic reputation. However, when an athlete such as Joscelin Yeo enters intercollegiate competition with an already established athletic reputation earned in the context of another country's amateur athletic program, there may exist a previously established protected interest. The member-institutions of the NCAA that are also government actors, such as UT-Austin, have an obligation to protect that interest in

---

[11] Although Yeo, at the time of oral argument, was about to graduate from UT-Austin as an Academic All-American having exhausted her remaining swimming eligibility after having earned five All-American honors at the 2003 NCAA Championships, UT-Austin contended that this case should not be dismissed as moot, largely because of the attorney's fees awarded.

26

making eligibility determinations. Such athletes have a right to be informed of any potential eligibility problems and to be afforded an opportunity to participate in the determination of their individual eligibility status. Because UT-Austin declared Yeo to be ineligible without even notifying her of the problem, UT-Austin violated Yeo's due course of law rights under the Texas Constitution. Accordingly, we affirm the trial court's decision.

_____

Mack Kidd, Justice

Before Justices Kidd, Yeakel and Patterson

Affirmed

Filed:   July 11, 2003

27