# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-IA-00282-SCT

*NATIONAL COLLEGIATE ATHLETIC ASSOCIATION*

*v.*

*BARNEY LEE FARRAR*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/21/2023 |
| TRIAL JUDGE: | HON. KENT E. SMITH |
| TRIAL COURT ATTORNEYS: | JIM WAIDE |
| | RACHEL PIERCE WAIDE |
| | J. CAL MAYO, JR. |
| | JOHN DICKSON MAYO |
| | KATE M. EMBRY |
| | JOHN BRUSTER "BRUSE" LOYD |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | J. CAL MAYO, JR. |
| | KATE M. EMBRY |
| ATTORNEYS FOR APPELLEE: | JIM WAIDE |
| | JOHN BRUSTER "BRUSE" LOYD |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND RENDERED - 12/12/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KING, P.J., BEAM AND GRIFFIS, JJ.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1. The National Collegiate Athletic Association (NCAA) appeals the trial court's denial of its motion for summary judgment on the grounds of due process and malicious interference with employment. Because no genuine issues of material fact exist and the NCAA is entitled to a judgment as a matter of law, the trial court's denial of the NCAA's

motion for summary judgment is reversed, and judgment is rendered in favor of the NCAA.

## FACTS AND PROCEDURAL HISTORY

*NCAA Membership, Bylaws, Enforcement, and Appeal*

¶2.    The NCAA is a voluntary, unincorporated association of colleges and universities that regulates intercollegiate athletics among its members to ensure fair athletic competition.  In order to fulfill the NCAA's purposes and to govern its activities, the NCAA members adopted bylaws regarding various issues including the health and welfare of student-athletes, academic integrity, admissions, and recruiting.  Each NCAA member agrees to follow and enforce the NCAA's bylaws.  All staff, student athletes, and other individuals representing the member institution's athletics interests must also comply with the bylaws, and the member institution is responsible for such compliance.

¶3.    To ensure compliance with the rules, the NCAA members adopted an enforcement process.  Under the enforcement process, the NCAA's enforcement staff investigates alleged violations of the bylaws by an NCAA member institution.  NCAA member institutions and their staff members "have an affirmative obligation to cooperate fully with and assist the NCAA enforcement staff" in its investigation.  If after an investigation, the enforcement staff determines there is sufficient information to conclude a violation occurred, the enforcement staff delivers to the member institution and any member employee a notice of allegations outlining the alleged NCAA rules violation and supporting information.  The member institution and employee then have an opportunity to review the notice of allegations and supporting investigative information, obtain and gather additional information, and provide

2

that information in response to the notice of allegations.

¶4.    After completion of the investigation and receipt of information, the NCAA's Committee on Infractions (COI) administers a hearing. The COI, comprised of persons who are not NCAA employees, conducts the hearing according to the NCAA's member-adopted procedures and bylaws. Under the bylaws, the COI "shall hold a hearing to make factual findings and to conclude whether violations of the NCAA constitution and bylaws occurred and, if so, to prescribe appropriate penalties." The COI, however, has no power to issue subpoenas or to legally compel a witness to appear or give sworn testimony. At the hearing, "the parties or their legal counsel may deliver opening and closing statements, present factual information, make arguments, explain the alleged violations and answer questions from [the COI] panel members."

¶5.    Violations of NCAA rules are structured under the bylaws as Level I, severe breach of conduct, Level II, significant breach of conduct, and Level III, breach of conduct that is "isolated or limited in nature." Penalties for NCAA rule violations include a show-cause order, which the NCAA's bylaws define as

> an order that requires a member institution to demonstrate to the satisfaction of the [COI] why it should not be subject to a penalty or additional penalty for not taking appropriate disciplinary or corrective action with regard to an institutional staff member or representative of the institution's athletics interests found by the committee as having been involved in a violation of the NCAA constitution and bylaws.

According to the COI's internal operating procedures, show-cause orders "may be general in nature or have specific conditions attached to them" and "run to the individual's conduct that violated NCAA legislation while on staff at a member institution."

3

¶6. The COI's decision may be appealed to the NCAA's Infractions Appeals Committee (IAC). Under the NCAA's bylaws, the IAC

> shall be comprised of five members. At least one member shall be from the general public and shall not be connected with a collegiate institution, conference, or professional or similar sports organization, or represent coaches or athletes in any capacity. The remaining members shall presently or previously be on the staff of an active member institution or member conference, but shall not serve presently on the Board of Directors.

The IAC considers appeals from the COI involving Level I or Level II violations, and it may "[a]ffirm, reverse, or vacate and/or remand the [COI]'s findings, conclusions, penalties, corrective actions, requirements, and/or other conditions and obligations of membership prescribed for violations of the NCAA constitution and bylaws[.]"

*NCAA's Investigation of the University of Mississippi*

¶7. The NCAA conducted an investigation involving the University of Mississippi, a Division I and NCAA member institution. The NCAA's investigation included twenty-one allegations of violations that occurred over a five-year period. The violations included recruiting violations committed by University of Mississippi representatives as well as rule violations committed by six members of the football staff, one of which was Barney Farrar.

¶8. Farrar was employed with the University of Mississippi as an assistant athletics director for football from 2012 to December 2016, when he was terminated. Farrar's employment contract with the University of Mississippi required Farrar to comply with the NCAA's rules and bylaws, and Farrar understood that compliance was part of his employment responsibilities.

¶9. On January 22, 2016, the NCAA enforcement staff issued a notice of allegations to

4

the University of Mississippi regarding its football program. Later, on February 22, 2017, a final notice of allegations was issued to the University of Mississippi regarding various coaches, the operations coordinator, and Farrar. The University of Mississippi and Farrar responded to the allegations. Farrar denied in part and admitted in part the allegations.

*COI Hearing and IAC Appeal*

¶10. In September 2017, the COI conducted a two-day hearing. Farrar, along with his counsel, appeared at the hearing. Neither Farrar nor his attorney was permitted to ask questions or cross-examine any witnesses.[1] After the hearing, the COI found that Farrar had committed multiple violations of the NCAA's bylaws related to recruiting. Specifically, the COI found that Farrar (1) arranged for football recruits to receive free merchandise, (2) arranged for boosters to provide football recruits free transportation, meals, and hotel lodging, and (3) arranged for boosters to make cash payments between $13,000 to $15,600 to one football recruit. The COI further found that Farrar violated the NCAA's ethical conduct bylaws by providing false or misleading information during his December 1, 2016 interview with the enforcement staff regarding his involvement with the violations.

¶11. The COI determined that these violations constituted Level I violations, which are considered severe breaches of conduct that seriously undermine or threaten the integrity of the NCAA Collegiate Model. The COI, after considering aggravating and mitigating factors, concluded as follows:

> [Farrar] referred two prospects to the retail establishment, where they received free merchandise. He arranged impermissible lodging, meals, and

---

[1] Subject to COI procedures, only the COI may ask questions at the hearing.

transportation for visiting prospects and maintained a second phone that he used for recruiting activities in violation of institutional policy. When student-athlete 1 expressed a desire to be paid for his commitment to attend Mississippi, [Farrar] referred him to boosters 9 and 10, who provided student-athlete 1 with thousands of dollars. During the investigation, [Farrar] provided false information to the enforcement staff. Therefore, . . . the [COI] prescribes a five-year show-cause order pursuant to [NCAA] Bylaw 19-9-5-4. The show-cause period shall run from December 1, 2017, through November 30, 2022. Any NCAA member institution employing [Farrar] during the five-year period shall prohibit him from all recruiting duties, both on-and off-campus.

¶12. Farrar appealed the COI's decision to the IAC. On November 1, 2018, the IAC upheld the COI's factual findings, conclusions, and penalties. In its decision, the IAC noted that it would "set aside a finding only upon a showing that information that might have supported a contrary result clearly outweighed the information upon which the [COI] based the finding." The IAC concluded:

Although [Farrar] set forth information that might support a contrary result, this information was limited to the finding he arranged for prospective student-athletes to receive free merchandise. He did not provide any specific information to refute the findings related to the provision of free lodging or cash payments for prospective student-athletes, or his unethical conduct. [Farrar]'s general objections to the [COI's] reliance on statements from the student-athlete witness, whom the [COI] determined to be credible, do not clearly outweigh the information on which the [COI] based its findings related to the remaining impermissible recruiting inducements. They also do not support a contrary result with respect to the unethical conduct violation.

*Circuit Court Complaint and Summary Judgment*

¶13. On July 22, 2020, Farrar filed a complaint against the NCAA in the Circuit Court of Lafayette County and alleged the following causes of action: (1) negligence and denial of a fair hearing tribunal, (2) malicious interference with employment, (3) denial of due process under the Mississippi Constitution, and (4) usurpation of judicial function. The NCAA

6

moved for summary judgment on Farrar's claims. After a hearing, the trial court granted in part and denied in part the motion. Specifically, the trial court granted the NCAA's motion as to Farrar's claims of negligence, denial of a fair hearing tribunal, and usurpation of judicial function, but it denied the NCAA's motion as to Farrar's claims of malicious interference with employment and denial of due process.

*Petition for Interlocutory Appeal*

¶14. The NCAA timely petitioned for interlocutory appeal on the issues of due process and malicious interference with employment. In its petition, the NCAA argued (1) it was not a state actor in connection with the enforcement process for due process purposes, and (2) Farrar offered no proof of malice by the NCAA. This Court granted the petition.

**STANDARD OF REVIEW**

¶15. When considering a trial court's grant or denial of summary judgment, this Court employs a de novo standard of review. ***Miss. Hub, LLC v. Baldwin***, 358 So. 3d 305, 307-08 (Miss. 2023) (citing ***Short v. Columbus Rubber & Gasket Co.***, 535 So. 2d 61, 63 (Miss. 1988)). "The evidence is viewed in the light most favorable to the party opposing the motion. The moving party has the burden of demonstrating no genuine issue of material fact exists." ***Id.*** (internal quotation marks omitted) (quoting ***Kinney v. S. Miss. Plan. & Dev. Dist., Inc.***, 202 So. 3d 187, 192 (Miss. 2016)). "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" ***Id.*** (internal quotation marks

7

omitted) (quoting *Kinney*, 202 So. 3d at 192). "This Court reviews 'questions of law de novo.'" *HWCC-Tunica, Inc. v. Miss. Dep't of Revenue*, 296 So. 3d 668, 673 (Miss. 2020) (quoting *Campbell Props., Inc. v. Cook*, 258 So. 3d 273, 275 (Miss. 2018)).

## DISCUSSION

I.     *Due Process*

      A.     *Whether the Mississippi Constitution requires state action for due-process violations.*

¶16.   The NCAA asserts it did not engage in state action in connection with its investigation of the University of Mississippi. Because the NCAA claims it took no governmental action in its investigation and enforcement process, it argues the due-process provision under the Mississippi Constitution is inapplicable. Farrar, however, argues that unlike the United States Constitution, "the Mississippi Constitution does not require state action as a condition for invocation of due process."

¶17.   The language of the due-process provisions of the United States Constitution and the Mississippi Constitution are different. The United States Constitution provides that "[n]o *State* shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV (emphasis added). The Mississippi Constitution provides, "[n]o *person* shall be deprived of life, liberty, or property except by due process of law." Miss. Const. art. 3, § 14 (emphasis added).

¶18.   Despite the difference in language, "this Court has regarded Article 3, Section 14 of [the Mississippi Constitution] to be 'essentially identical' to its federal counterpart." *Tunica Cnty. v. Town of Tunica*, 227 So. 3d 1007, 1016 (Miss. 2017) (citing *Nat'l Collegiate*

8

*Athletic Ass'n v. Gillard*, 352 So. 2d 1072, 1081 (Miss. 1977)). Indeed, "'[t]he due process required by the Federal Constitution is the same "due process of law" which is required by' [the Mississippi Constitution under] Article 3, Section 14." *Id.* (first alteration in original) (quoting *Walters v. Blackledge*, 220 Miss. 485, 71 So. 2d 433, 515 (1954)). "Due process guards each person's every substantial entitlement created and made legitimate and protected from interference by the positive law of the *state*." *Id.* (emphasis added) (internal quotation marks omitted) (quoting *In re Validation of $7,800,000 Combined Util. Sys. Revenue Bond, Gautier Util. Dist., Jackson Cnty.*, 465 So. 2d 1003, 1018 (Miss. 1985)). Thus, despite Farrar's assertion, the Mississippi Constitution requires state action for due-process violations under Article 3, Section 14.

> B.   Whether the NCAA was a state actor in connection with its investigation and enforcement process of the University of Mississippi.

¶19.   ["][S]tate action requires both an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible', and that 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.'"

*Diamondhead Country Club & Prop. Owners Ass'n, Inc. v. Montjoy*, 820 So. 2d 676, 682 (Miss. Ct. App. 2000) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999)).

¶20.   Whether the NCAA was a state actor and acted under the force of state law was discussed in *National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 199, 109 S. Ct. 454, 102 L. Ed. 2d 469 (1988). There, the Court "granted certiorari to review the Nevada

9

Supreme Court's holding that the NCAA engaged in state action when it conducted its investigation and recommended that [the men's basketball coach at the University of Nevada, Las Vegas (UNLV), Jerry Tarkanian,] be disciplined." *Id.* at 182. The NCAA had placed the UNLV men's basketball program on probation for two years "and ordered UNLV to show cause why the NCAA should not impose further penalties unless UNLV severed all [employment] ties" with Tarkanian. *Id.* at 181. Tarkanian filed a 42 U.S.C. § 1983 action against the NCAA for alleged deprivations of his due-process rights under the Fourteenth Amendment. *Id.* at 181, 187. The Court ultimately concluded that UNLV's decision to take action in compliance with the NCAA rules and recommendations did not transform the NCAA's conduct into state action. *Id.* at 193-99.

¶21.    The Court emphasized that "the source of the legislation adopted by the NCAA [wa]s not Nevada but the collective membership, speaking through an organization that [wa]s independent of any particular State." *Id.* at 193. The Court noted that "[s]tate action . . . might lie if UNLV, by embracing the NCAA's rules, transformed them into state rules and the NCAA into a state actor." *Id.* at 194. But that had not occurred because "UNLV retained the authority to withdraw from the NCAA and establish its own standards. The university alternatively could have stayed in the [NCAA] and worked through the [NCAA's] legislative process to amend rules or standards it deemed harsh, unfair, or unwieldy." *Id.* at 194-95.

¶22.    Additionally, the Court found that "UNLV delegated no power to the NCAA to take specific action against any university employee. The commitment by UNLV to adhere to NCAA enforcement procedures was enforceable only by sanctions that the NCAA might

10

impose on UNLV itself." *Id.* at 195-96.

¶23. Finally, the Court noted that, during the course of the investigation, "the NCAA and UNLV acted much more like adversaries than like partners engaged in a dispassionate search for the truth." *Id.* at 196. Under these circumstances, the Court determined that "the NCAA [wa]s properly viewed as a private actor at odds with the State when it represents the interests of its entire membership in an investigation of one public university." *Id.*

¶24. Since *Tarkanian*, other courts have declined to characterize the NCAA as a state actor in analogous scenarios. For example, in an action against the NCAA for an alleged violation of bylaws, the United States District Court for the Eastern Division of Arkansas found the NCAA was not a state actor for purposes of claims under 42 U.S.C. § 1983 and the Arkansas Civil Rights Act because "[m]aterials attached to Arkansas Tech's complaint confirm that the NCAA is comprised of members across the United States and Canada" and not "solely of schools within a single state[.]" *Bd. of Trs. of Ark. Tech Univ. v. Nat'l Collegiate Athletic Ass'n*, No. 4:17-cv-00439 BSM, 2018 WL 2347062, at *2 (E.D. Ark. May 23, 2018). Additionally, in addressing a § 1983 due-process claim, the Unites States District Court for the Eastern District of Washington found "the NCAA [wa]s not a state actor," stating:

> the NCAA "does not take action against student-athletes, but only against member institutions." . . . [T]he individual member institutions choose to comply with the NCAA's rules. An NCAA determination is communicated to the affected member institution rather than to a non-complying individual so that the member institution can make a decision regarding its compliance with NCAA regulations.

*Matthews v. Nat'l Collegiate Athletic Ass'n*, 79 F. Supp. 2d 1199, 1207 (E.D. Wash. 1999).

11

¶25. Here, as in *Tarkanian*, the NCAA is a "collective membership, speaking through an organization that is independent of any particular State." *Tarkanian*, 488 U.S. at 193. Like UNLV in *Tarkanian*, the University of Mississippi's decision to embrace the NCAA's rules did not transform them into state rules and the NCAA into a state actor since the University of Mississippi retained the power to withdraw from the NCAA and to establish its own standards. *Id.* at 194. Additionally, there is no evidence that the University of Mississippi delegated power to the NCAA to take action against Farrar. Indeed, the record reflects that the "commitment by [the University of Mississippi or other member institutions] to adhere to NCAA enforcement procedures was enforceable only by sanctions that the NCAA might impose on [the University of Mississippi or other member institutions.]" *Id.* at 196.

¶26. Farrar asserts *Tarkanian* does not apply because unlike *Tarkanian*, the University of Mississippi and NCAA were not adversaries. *Id.* at 196. Instead, according to Farrar, the University of Mississippi "joined in the NCAA's attack on Farrar" making the NCAA "a willful participant in a joint activity with the State or its agents." In other words, Farrar claims the NCAA is a state actor because it engaged in joint activity with the University of Mississippi. We disagree.

¶27. The joint activity alleged by Farrar in support of his claim includes

> [t]he fact that the University [of Mississippi] attacked Farrar to the NCAA by claiming his actions were "disturbing," and the fact that [the University of Mississippi] fired Farrar before any hearing whatsoever, after it learned of NCAA charges, and the fact that the NCAA commended the University of Mississippi for its "cooperation" and listed its "cooperation" as being a "mitigating factor[.]"

¶28. But simply because the University of Mississippi cooperated with the NCAA's

12

investigation and ultimately terminated Farrar due to his "disturbing" actions does not amount to "acting jointly" with "the NCAA's attack on Farrar" to make the NCAA a state actor for purposes of due process. First, the University of Mississippi was obligated to cooperate under the NCAA's bylaws. Nevertheless, despite Farrar's assertion, the COI found "[t]he University [of Mississippi]'s level of cooperation did not rise to the level of exemplary because an institution must do more than just meet its obligations under the bylaws to cooperate." Second, Farrar was terminated in December 2016, *before* the NCAA issued its notice of allegations regarding Farrar and before the COI's decision and show-cause order were imposed. And Farrar admitted to some of the NCAA's alleged violations,[2] making his termination justified under his contract with the University of Mississippi, regardless of the NCAA's findings.[3]

¶29. Finally, the record reflects that despite its cooperation with the NCAA, the University of Mississippi opposed many of the NCAA's allegations against it, including allegations of violations by Farrar. For instance, the University of Mississippi disputed the allegation[4] that Farrar arranged on separate occasions for prospective student athletes to receive free

---

[2] Farrar admitted he used a burner phone to contact prospective student athletes outside the contacts permitted by the NCAA's rules, he admitted he violated the NCAA's rules by arranging transportation, lodging, and meals for prospective student athletes, and he admitted he lied to the NCAA's enforcement staff on multiple occasions during the investigation.

[3] Under Farrar's contract with the University of Mississippi, any violation of the NCAA's bylaws or the failure to report any violation of the bylaws was grounds for termination for cause.

[4] Allegation No. 9(b)-(c).

merchandise and the allegation[5] that Farrar coordinated cash payments between $13,000 to $15,600 to a prospective student athlete between April 2014 and February 3, 2015. Additionally, in response to the allegation that Farrar violated the NCAA's principles of ethical conduct in connection with these allegations by knowingly providing false or misleading information to the NCAA during his December 1, 2016 interview, the University of Mississippi continued to deny the allegations and denied record support for Farrar's knowledge of the allegations. Thus, despite Farrar's assertions, the record does not support Farrar's attempts to characterize the NCAA and the University of Mississippi as "working jointly" to penalize him.

¶30. In support of his "joint activity" argument, Farrar relies on ***Cohane v. National Collegiate Athletic Ass'n ex rel. Brand***, 215 F. App'x 13 (2d Cir. 2007). In ***Cohane***, Cohane, a college basketball coach, filed suit against the NCAA and claimed he was forced to resign after the university's ratification of the NCAA's report and investigative findings. *Id.* at 14. The complaint alleged a pattern of collusion between the university and the NCAA. *Id.* at 15.

> In particular, the complaint allege[d] that the [u]niversity forced Cohane's resignation immediately upon learning of the charges in an attempt to placate the NCAA, actively participated in the case against Cohane in the hearings held by the Mid-American Conference and the NCAA, intimidated student-witnesses into giving false statements to NCAA investigators by threatening to wrongfully withhold their degrees, suborned perjury at the NCAA hearing, and adopted the [NCAA's] [r]eport and its findings thereby placing its *imprimatur* upon the defamatory statements and penalties imposed on Cohane.

---

[5] Allegation No. 16.

*Id.* (citations omitted). The NCAA moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Id.* The district court granted the motion and dismissed the NCAA. *Id.* at 14. Cohane appealed. *Id.*

¶31. On appeal, the United States Court of Appeals for the Second Circuit noted that at the motion-to-dismiss stage, it was required to "accept[] all the material allegations of the complaint as true[.]" *Id.* The Court found that "at this point in the litigation," it was error for the district court to grant the motion. *Id.* at 16. The Court stated that the allegations in the complaint, "if proven, could show that the [u]niversity willfully participated in joint activity with the NCAA to deprive Cohane of his liberty." *Id.*

¶32. Farrar's reliance on *Cohane* is misplaced. First, *Cohane* involved the trial court's ruling on a motion to dismiss, not a motion for summary judgment. *Id.* at 15. As such, mere allegations within the complaint were sufficient for Cohane to avoid dismissal.[6] Second, although Farrar alleges "joint activity" between the NCAA and the University of Mississippi, the evidence he presented to the trial court does not include the pattern of collusion set forth in *Cohane*. Indeed, there are no allegations that the University of Mississippi "improperly pressured students into providing false testimony," "suborned perjury at the NCAA hearing," or "abused its authority to confer or withhold degrees[.]" *Cohane*, 215 F. App'x at 15. Finally, Farrar has presented no evidence that the NCAA and the University of Mississippi

---

[6] Notably, at the summary-judgment stage, the Court granted the NCAA's motion for summary judgment and found "Cohane ha[d] failed to raise a genuine dispute as to whether the NCAA, a private entity, and [the university], a state actor, shared a common goal to violate his rights, let alone that they shared such a goal with respect to the decision to impose the show-cause order[.]" *Cohane v. Nat'l Collegiate Athletic Ass'n*, 612 F. App'x 41, 44 (2d Cir. 2015).

15

"shared a common goal to violate [Farrar's] rights[.]" ***Cohane***, 612 F. App'x at 44. Instead, this case involves a typical instance of the NCAA "represent[ing] the interests of its entire membership in an investigation of one public university"—in other words, the NCAA operat[ed] as a "private actor[.]" ***Tarkanian***, 488 U.S. at 196.

¶33. Farrar also asserts that even in cases in which "there is no demonstration of cooperation between the university and the NCAA, the NCAA and the state are joint actors" because "[t]he state universities have delegated regulation of athletes and coaching staff to the NCAA[.]" According to Farrar, this delegation "alone is enough to make the NCAA a state actor." In support, Farrar relies on ***Brentwood Academy v. Tennessee Secondary School Athletic Ass'n***, 531 U.S. 288, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001), and ***Mississippi High School Activities Ass'n, Inc. v. Coleman ex rel. Laymon***, 631 So. 2d 768 (Miss. 1994).

¶34. ***Brentwood Academy*** involved "a not-for-profit membership corporation organized to regulate interscholastic sport among the public and private high schools in Tennessee that belong[ed] to it." ***Brentwood Acad.***, 531 U.S. at 291. Brentwood Academy, a member school that the association penalized for violating a recruiting rule, sued the association under 42 U.S.C. § 1983, claiming the association's enforcement of the rule was state action that violated federal due process. ***Id.*** at 293. The Court found the "'necessarily fact-bound inquiry' le[d] to the conclusion of state action" since "[t]he nominally private character of the [a]ssociation [wa]s overborne by the pervasive entwinement of public institutions and public officials in its composition and workings." ***Id.*** at 298. Notably, the Court

distinguished *Tarkanian* stating:

> [In *Tarkanian*,] the NCAA's policies were shaped not by the University of Nevada alone, but by several hundred member institutions, most of them having no connection with Nevada, and exhibiting no color of Nevada law. [*Tarkanian*, 488 U.S.] at 193. Since it was difficult to see the NCAA, not as a collective membership, but as surrogate for the one State, we held the organization's connection with Nevada too insubstantial to ground a state-action claim. *Id.* at 193, 196[.]
>
> But dictum in *Tarkanian* pointed to a contrary result on facts like ours, with an organization whose member public schools are all within a single State. "The situation would, of course, be different if the [Association's] membership consisted entirely of institutions located within the same State, many of them public institutions created by the same sovereign." *Id.* at 193, n.13[.]

*Brentwood Acad.*, 531 U.S. at 297-98 (fourth alteration in original).

¶35. Similarly, *Coleman* involved a voluntary, nonprofit association of Mississippi public and private high schools. *Coleman*, 631 So. 2d at 771 n.1. "The power to regulate athletic programs [wa]s conferred upon the local school boards by the Mississippi Legislature. The school boards, in turn, delegated this authority to the [a]ssociation." *Id.* at 774 (citation omitted). Coleman filed suit on behalf of her son and alleged the association's "anti-recruiting rule" was unconstitutional and violated the Due Process Clause. *Id.* at 773. The Court noted that "[w]ithout state action, there can be no valid claim of unconstitutionality." *Id.* The Court found that because the association's actions flowed from statutory authority, the association was a state actor. *Id.* at 774. The Court specifically distinguished the association of Mississippi schools from the NCAA and *Tarkanian*, stating that, in *Tarkanian*, "[t]he University had not delegated governmental powers to the N.C.A.A., while in [*Coleman*], the school boards *ha[d]* delegated governmental powers to the [a]ssociation."

17

*Coleman*, 631 So. 2d at 774 n.3.

¶36.   ***Brentwood Academy*** and ***Coleman*** are distinguishable.  Here, unlike the state athletic associations in ***Brentwood Academy*** and ***Coleman***, the NCAA's members are not all within a single state.  Instead, the NCAA's members are spread across the country, and the University of Mississippi's membership role does not exceed the role of the other members. "[T]he NCAA's policies were shaped not by the [University of Mississippi] alone, but by several hundred member institutions, most of them having no connection with [Mississippi], and exhibiting no color of [Mississippi] law." ***Brentwood Acad.***, 531 U.S. at 297.  And here, unlike in ***Brentwood Academy*** and ***Coleman***, the University of Mississippi did not delegate to the NCAA any of the state of Mississippi's governmental powers.[7]  Rather, the University of Mississippi voluntarily joined the NCAA and consented to the NCAA's rules and processes adopted by its members.  The COI acted under authority of the NCAA's bylaws. The State did not employ the individuals involved in the investigation or resolution, and those involved exercised no state authority.  Thus, no regulatory entwinement exists between the State and the NCAA.

¶37.   Additionally, the challenged aspect of the NCAA's ruling does not take direct action against Farrar but, instead, requires that any member institution "show cause" before hiring Farrar in an athletics recruiting position for a specified period of time.  The member institutions have autonomy regarding compliance with that directive. *See* ***Tarkanian***, 488

---

[7]  As noted by the NCAA, "[n]either Farrar nor the trial court cited any Mississippi law delegating any governmental power to the NCAA or otherwise identified any governmental authority the State delegated to the NCAA."

U.S. at 194-95 ("UNLV retained the authority to withdraw from the NCAA and establish its own standards. The university alternatively could have stayed in the [NCAA] and worked through the [NCAA's] legislative process to amend rules or standards it deemed harsh, unfair, or unwieldy").

¶38. "[S]tate action requires . . . that 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.'" *Montjoy*, 820 So. 2d at 682 (quoting *Sullivan*, 526 U.S. at 50). Here, the NCAA cannot "fairly be said to be a state actor." *Id.* (citing *Sullivan*, 526 U.S. at 50). As in *Tarkanian*,

> The NCAA enjoyed no governmental powers to facilitate its investigation. It had no power to subpoena witnesses, to impose contempt sanctions, or to assert sovereign authority over any individual. Its greatest authority was to threaten sanctions against [the University of Mississippi], with the ultimate sanction being expulsion of the university from membership. . . . [T]he NCAA did not [and] could not[]directly discipline [Farrar] or any other state university employee.

*Tarkanian*, 488 U.S. at 197. The sanctions imposed by the NCAA were made under the University of Mississippi's membership in the association, not under any force of state law. *See id.* at 199 ("It would be more appropriate to conclude that UNLV has conducted its athletic program under color of the policies adopted by the NCAA, rather than that those policies were developed and enforced under color of Nevada law."). Accordingly, the NCAA is not a state actor, and summary judgment should have been granted.

## II.     *Malicious Interference with Employment*

¶39. Farrar asserts "there are issues of material fact as to whether the NCAA intentionally used absurd and unfair procedures to find Farrar guilty of serious NCAA rules violations and

19

used its baseless findings to affect Farrar's employment." We disagree.

¶40. Four elements are necessary to prove a claim of tortious interference with a business relationship:

(1) The acts were intentional and willful;

(2) The acts were calculated to cause damage to the plaintiffs in their lawful business;

(3) The acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice);

(4) Actual damage and loss resulted.

*MBF Corp. v. Century Bus. Commc'ns, Inc.*, 663 So. 2d 595, 598 (Miss. 1995) (citing

*Nichols v. Tri-State Brick & Tile*, 608 So. 2d 324, 328 (Miss. 1992)). In his complaint,

Farrar alleged:

By entering an order expressly affecting [his] future employment, [the NCAA] exceeded any authority it had over [Farrar] and exceeded any authority it had in any contract with [Farrar]. [The NCAA] committed the Mississippi law tort of malicious interference with employment. [The NCAA]'s acts in affecting [Farrar's] future employment constitute the tort of malicious interference with prospective employment[.]

In other words, Farrar claims that the mere issuance of the show-cause order under the infractions process constitutes malicious interference with his prospective business relations.

¶41. The NCAA is a private association that adopts and enforces its own rules. Under the NCAA's rules, the COI prescribes penalties for violations of the NCAA's bylaws, subject to review by the IAC. The NCAA's infractions process includes a show-cause penalty, which the COI may use when appropriate under the bylaws. This member-adopted

20

enforcement mechanism is not unique to Farrar or the infractions process involving the University of Mississippi. Rather, the bylaws apply to all member institutions across the country and, by extension, to the employees and representatives of the member institutions.

¶42. The NCAA followed and enforced its bylaws, as adopted by its members, in connection with the enforcement and infractions process involving the University of Mississippi. Following an infractions hearing, the COI concluded Farrar committed multiple Level I violations of the NCAA's bylaws related to recruiting and violated the NCAA's ethical conduct rules by providing false and incomplete information to the NCAA's enforcement staff during its investigation of the University of Mississippi. Having found violations, the COI then prescribed penalties, consistent with the bylaws. The COI considered aggravating and mitigating factors affecting penalties, and it found Farrar's violations to be aggravated. The COI imposed a five-year show-cause condition to a member institution's employment of Farrar in a recruiting position consistent with the NCAA bylaws and penalty guidelines.

¶43. By adopting and enforcing its bylaws, the NCAA did not engage in intentional and willful acts calculated to cause damage to Farrar in his lawful business and with the unlawful purpose of causing damage and loss to Farrar, without right or justifiable purpose, as required to prove malicious interference with prospective business relations. *Id.* (citing *Nichols*, 608 So. 2d at 328). Rather, the NCAA's members adopted and the COI enforced the bylaws in furtherance of the NCAA's mission to "uphold integrity and fair play among the NCAA membership, and to prescribe appropriate and fair penalties if violations occur" and "ensure

21

that those institutions and student-athletes abiding by the NCAA constitution and bylaws are not disadvantaged by their commitment to compliance."

¶44. Farrar has submitted no testimony from COI members or anyone else indicating any involved person acted with malice. He identifies no documents suggesting anyone acted with malice. Instead, the record reflects that the COI considered the information presented, engaged in a lengthy two-day hearing, deliberated, and made collective findings as to the enforcement staff's allegations, including those involving Farrar.

¶45. Regarding the facts supporting the COI's decision, Farrar ultimately admitted many of the violations after he had denied any misconduct during several interviews with the NCAA's enforcement staff investigators. As outlined in its findings, the COI had significant information connecting Farrar to those allegations that he continued to deny. Thus, the COI had grounds to doubt Farrar's statements and to reject his version of events due to his deception and lack of candor. Based on the information available in September 2017, the COI had justifiable support for its conclusions.

¶46. Notably, Farrar does not dispute that he violated NCAA rules while he was employed at the University of Mississippi nor does he dispute that the COI followed the NCAA's bylaws in connection with its enforcement proceedings and issued a show-cause condition consistent with the bylaws. Instead, Farrar claims that the NCAA's enforcement processes are "absurd and unfair."

¶47. But as the NCAA asserted at the summary-judgment hearing:

> [T]he attack here is on the ability to even have [the show-cause] as a provision. Is it even appropriate? That's the attack. Is it right for the NCAA to have that

as a provision, that it can impose a show cause on someone where they can't have an athletically-related or, in this instance, it's even narrower, a recruiting-related job at [a] member institution. Can the NCAA members decide they want to have that as part of their governance? And the answer to that is yes. There is nothing wrong with having that. It'd be like if you're in a hunting club and somebody keeps coming in and shooting too many deer or shooting the wrong deer or hunting on days when they can't and you have a provision that says once somebody has done this three times, they're going to be out for five years. They can't come back and hunt. We don't care if they paid their membership dues and all that. That's a violation of the rules. These are rules we want to govern us. That's how we want to play with our hunting club. Well, that's what's happened here. The [NCAA's] members decided they wanted to have that provision and it was used here. And the simple use of that rule that the members have given themselves as part of their self-governance, that by itself . . . can't be tortious interference.

We agree and find Farrar has failed to prove tortious interference with a business relationship. Consequently, summary judgment should have been granted.

¶48. For the first time on appeal, Farrar argues the NCAA's findings are not competent summary-judgment evidence. Farrar asserts "[t]he only factual support in the record that [he] committed serious NCAA violations is the findings of the [COI]," which he claims to be "double hearsay since it is based upon what the NCAA enforcement staff told the committee in unsworn statements at the hearing and upon thousands of pages of investigative reports[.]"

¶49. "[W]e do not consider arguments raised for the first time on appeal." *Bay Point Props., Inc. v. Miss. Transp. Comm'n*, 201 So. 3d 1046, 1055 (Miss. 2016). "We do not hold trial courts in error on issues not presented to them for consideration." *Id.* Because Farrar's hearsay argument is made for the first time on appeal, it is procedurally barred. *Id.*; *see also Johnson v. State*, 247 So. 3d 300, 302 (Miss. Ct. App. 2017) ("[S]ince these arguments are made for the first time on appeal, they are procedurally barred." (citing

*Gardner v. State*, 531 So. 2d 805, 808-09 (Miss. 1988))).

¶50.  Notwithstanding the procedural bar, Farrar's hearsay argument fails.  Farrar's malicious-interference-with-employment claim does not turn on a determination of the validity of the NCAA's allegations.  Instead, his claim turns on the presence of malice in the NCAA's decision-making process and its penalty-imposition process in 2017.  And as discussed, Farrar fails to show that the NCAA acted with malice.

¶51.  Farrar also argues for the first time on appeal that the NCAA's actions violate the Sherman Antitrust Act.  Farrar asserts:

> The NCAA's rule limiting the amount of contact that a coach may have with a potential recruit by telephone has a self-evident effect of limiting competition for that recruit. Farrar has sworn that all coaches must necessarily exceed the NCAA limitation on number of contacts in order to effectively recruit. Since all recruiting coaches must necessarily exceed the NCAA's limitation as a job requirement, the NCAA's arbitrary selection of certain coaches and institutions to prosecute for such contact necessarily infringes competition, and is a likely violation of the Sherman Act, 15 U.S.C. § 1.

But whether the NCAA's actions violated antitrust laws was not raised in or determined by the trial court and is, therefore, procedurally barred.  *Bay Point Props., Inc.*, 201 So. 3d at 1055.  Procedural bar notwithstanding, the antitrust issue has no relevance as to whether or not the NCAA acted with malice in its decision-making process regarding Farrar.

## CONCLUSION

¶52.  The record reflects that the NCAA neither denied Farrar's due-process rights under the Mississippi Constitution nor maliciously interfered with his prospective business relations.  Accordingly, the trial court erred by denying the NCAA's motion for summary judgment on these grounds.  We reverse the trial court's order denying the NCAA's motion

24

for summary judgment, and we render judgment as a matter of law in favor of the NCAA.

¶53.   **REVERSED AND RENDERED.**

**KITCHENS AND KING, P.JJ., BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR.  RANDOLPH, C.J., DISSENTS DUBITANTE WITH SEPARATE WRITTEN OPINION.  COLEMAN AND MAXWELL, JJ., NOT PARTICIPATING.**

**RANDOLPH, CHIEF JUSTICE, DISSENTING DUBITANTE:**

¶54.   At this stage of the proceeding, the trial judge is faced with more questions than answers.  A multitude of boilerplate words abound throughout the pleadings and exhibits. *See* Maj. Op. ¶ 2.   Does the NCAA regulate college athletics to ensure *fair* competition?  Does the NCAA operate to ensure the health and welfare of student athletes?  Does the NCAA consistently enforce academic integrity for each member?  Did the NCAA comply with its own rules in this case?  Are the Due Process Clauses of the United States and Mississippi Constitutions identical?

¶55.   The NCAA contends that the NCAA "has a right to adopt and enforce its rules and infractions process without judicial interference or second guessing . . . ."  Respectfully, an intervening decision of the United States Supreme Court unanimously dispelled that notion. *See **Nat'l Collegiate Athletic Ass'n v. Alston***, 594 U.S. 69, 141 S. Ct. 2141, 210 L. Ed. 2d 314 (2021).  Prior to ***Alston***, the Lafayette County Circuit Court found that factual issues existed as to whether the NCAA's procedures violated Farrar's due process rights as written in the Mississippi Constitution.  Moreover, the trial judge found that factual questions remained as to whether the NCAA maliciously interfered with Farrar's future employment. I find no legal error in the trial judge's desire to see and hear more.  Too many questions and

not enough answers exist for me to conclude that the trial judge erred by denying the NCAA's motion for summary judgment.

¶56.   When examining any provision of our Constitution, "the Court begins by examining the plain text of our Constitution." ***Butler v. Watson (In re Initiative Measure No. 65)***, 338 So. 3d 599, 607 (Miss. 2021). "We enforce the 'plain language' of the Constitution." ***Id.*** (quoting ***Thompson v. Att'y Gen. of Miss.***, 227 So. 3d 1037, 1041 (Miss. 2017)). "The Court 'must enforce the articles of the Constitution as written.'" ***Id.*** (quoting ***Pro-Choice Miss. v. Fordice***, 716 So. 2d 645, 652 (Miss. 1998)). "[A] court ought to 'bow with respectful submission to its provisions[,]' not 'take liberties' with its text[.]" ***Id.*** (citations omitted).

¶57.   Today's majority opinion opines that the language of the due process provisions of the United States Constitution and the Mississippi Constitution are different. Maj. Op. ¶ 17. The United States Constitution establishes that "[n]o *State* shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV (emphasis added). The Mississippi Constitution reads, "[n]o *person* shall be deprived of life, liberty, or property except by due process of law." Miss. Const. art 3, § 14 (emphasis added).

¶58.   I must admit that I failed to recognize the distinction when I cited ***National Collegiate Athletic Ass'n v. Gillard***, 352 So. 2d 1072 (Miss. 1977), and ***Walters v. Blackledge***, 220 Miss. 485, 71 So. 2d 433 (1954), fourteen years ago in ***Carl Ronnie Daricek Living Trust v. Hancock County ex rel. Board of Supervisors***, 34 So. 3d 587, 594 (Miss. 2010). Today, I recognize the words of wisdom opined by former United States Supreme Court Justice

26

Robert Jackson and repeated by Justice Randy Pierce, formerly of this Court, that "I see no reason why I should be consciously wrong today because I was unconsciously wrong yesterday." *Massachusetts v. United States*, 333 U.S. 611, 639-40, 68 S. Ct. 747, 92 L. Ed. 968 (1948) (Jackson, J., dissenting); *see also Hye v. State*, 162 So. 3d 750, 759 (Miss. 2015).

¶59.    Unfortunately the Court has not recognized the distinction.  Rather than applying the words of the Mississippi Constitution as written, this Court has conflated the two. Previously, this Court wrote that "[t]he due process required by the Federal Constitution is the same 'due process of law' which is required by Section 14 of the Constitution of the State of Mississippi[.]" *Walters*, 71 So. 2d at 444.  The two provisions are unambiguously different. The Court, however, described the two provisions as "identical."  *See Gillard*, 352 So. 2d at 1081 ("[T]he due process clause of either section 14 of the Mississippi Constitution or the Fourteenth Amendment of the United States Constitution . . . are identical.").  Such a holding is as much an error today as when *Gillard* and *Walters* were written.